MOBILE MECHANICAL CONTRAC-
TORS ASSOCIATION,
INC., Plaintiff,

v.

Edward J. CARLOUGH, K. C. Doby, Jimmy A. Hinkle, A. Bruce McKenzie, John R. Falvella, Sheet Metal Workers International Association, an unincorporated association, Sheet Metal Workers International Association Local Union # 441, an unincorporated association, Defendants.

Civ. A. No. 74–409–H.

United States District Court,
S. D. Alabama, S. D.

Aug. 17, 1978.

**314**

Roderick P. Stout, Mobile, Ala., for Carlough, Doby, Hinkle & Unions.

Jerome A. Cooper, Birmingham, Ala., Harry Huge and Thomas J. McGrew, Washington, D. C., Donald W. Fisher, Toledo, Ohio, for A. Bruce McKenzie and John R. Falvella.

Willis C. Darby, Jr., and John Richard Carrigan, Mobile, Ala., for plaintiff.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT

HAND, District Judge.

### INTRODUCTORY STATEMENT

Since this lengthy litigation began on October 1, 1974, the complaint has been twice amended, partial summary judgment entered on December 29, 1975, and the United States Court of Appeals for the Fifth Circuit in part affirmed and in part remanded that partial summary judgment, 566 F.2d 1213 (5th Cir. 1977). As the Fifth Circuit recognized, certain issues relating to damage claims by Mobile Mechanical Contractors Association, Inc. (MMCA) remain pending, and careful consideration of these claims may be aided by a brief statement of the underlying basis for each of these claims.

MMCA seeks damages in its Third, Fourth, Fifth, and Seventh Causes of Action. Damages are sought against Carlough and the Sheet Metal Workers' International Association (SMWIA); no damages are sought against the other union defendants, Doby, Hinkle, and Sheet Metal Workers International Association Local Union No. 441 (Local 441).

The Third Cause of Action seeks damages against Carlough and SMWIA as a matter of federal law, based upon a damage remedy implied by Section 302 of the Labor Management Relations Act of 1947 (LMRA), as amended, 29 U.S.C. § 186. This Cause of Action would therefore depend upon, first, whether a violation of Section 302 has taken place; and, second, whether a damage remedy is implied under the analysis of the United States Supreme Court set out in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). The U.S. Court of Appeals for the Third Circuit recognized such an implied damage remedy for violation of Section 302 in *Nedd v. United Mine Workers*, 556 F.2d 190 (3d Cir. 1977). There is also a question, recognized but not decided by the Fifth Circuit, whether this court may assert jurisdiction over the Third Cause of Action under 28 U.S.C. § 1337, as an action "arising under" an act of Congress regulating commerce.

The Fourth Cause of Action presents pendent state law claims against Carlough and SMWIA, and the Fifth Cause of Action presents a diversity claim under state law against Carlough individually and as representative of members of SMWIA, pursuant to Rule 23.2, F.R.Civ.P. MMCA has argued that, whether or not a damage remedy is implied by federal law for violation of Section 302, Alabama state law gives a damage remedy for a person injured by wrongful interference with its lawful business. MMCA also seeks punitive damages in the Fourth and Fifth Causes of Action. MMCA has argued that Alabama law has long recognized that a person injured in his person or property by breach of a duty imposed by

law may recover damages, Ala.Constitution of 1901, Art. I, Sec. 13. Specifically, MMCA argues a claim based upon the Alabama tort of wrongful interference with a lawful occupation, on the basis that defendants Carlough and SMWIA caused a strike for SASMI which violated Section 302, and which resulted in injury to MMCA.

The Third, Fourth, and Fifth Causes of Action each depend upon a determination that MMCA was injured by activity of defendants Carlough and SMWIA that violated Section 302. Therefore the lawfulness of the activities of Carlough and SMWIA under Section 302 is a critical underlying question in each such cause of action.

The Seventh Cause of Action rests on a different theory, and different jurisdictional basis. MMCA asserts under the Seventh Cause of Action that it is entitled to damages under Section 303 of the LMRA, 29 U.S.C. § 187, which gives a cause of action in federal court to anyone injured by a violation of Section 8(b)(4) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4). MMCA asserts that Carlough and SMWIA violated Section 8(b)(4)(A), 29 U.S.C. § 158(b)(4)(A), by efforts to force MMCA to join an "employer organization" within the meaning of Section 8(b)(4)(A). A damage action under Section 303 by an employer allegedly forced to act as if it joined an employer organization within the meaning of Section 8(b)(4)(A) has been upheld in *Frito-Lay, Inc. v. Teamsters*, 401 F.Supp. 370 (N.D.Cal.1975); and damages were awarded in that case after trial. *Frito-Lay, Inc. v. Teamsters*, 94 LRRM 3047 (March 26, 1976 and February 8, 1977).

MMCA has argued that the demand for SASMI necessarily included as a condition of SASMI that MMCA agree to Article X, Section 8, of the SMWIA "Standard Form of Union Agreement" (MMCA Exhibit 33, 10/8/74). Article X, Section 8, would provide for determination of subsequent contract terms by the "National Joint Adjustment Board", which is composed of representatives of SMWIA and representatives of Sheet Metal and Air Conditioning Contractors' National Association (SMACNA).

MMCA has argued that SMACNA is an employer organization, and the demand for SASMI included a demand for Article X, Section 8, which thereby violated Section 8(b)(4)(A) as an effort to force MMCA to join an "employer organization." MMCA further argued that Section 8(b)(4)(A) prohibits union efforts to force involuntary industry-wide bargaining and MMCA has contended that Carlough and SMWIA sought to force MMCA to engage in industry-wide bargaining with respect to SASMI.

The question of the legal sufficiency of the claims of MMCA in the Third, Fourth, Fifth, and Seventh Causes of Action appear to be issues of law, rather than issues as to which there is a disputed material fact. The amount of damages, however, appears to be a question of fact.

On March 7, 1975, the Union Defendants (Carlough, Doby, Hinkle, SMWIA, and Local 441) moved for summary judgment on all issues raised by the amended complaint, including the First, Second, Third, Fourth, and Fifth Causes of Action. After submission of briefs and due consideration of testimony at the October 8, 1974, hearing on preliminary injunction and testimony presented by defendants at the March 21, 1975 argument on summary judgment, affidavits, other evidence and arguments of counsel, this court on April 4, 1975, carried the motion for summary judgment with the case. On September 17, 1975, the court granted the motion of MMCA to amend the complaint to state the Seventh Cause of Action, a damage claim arising under Section 303 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 187. On November 21, 1975, Carlough, Doby, Hinkle, SMWIA, and Local 441 filed a motion for summary judgment as to the Seventh Cause of Action. Such motion was denied on March 26, 1976.

On December 29, 1975, this court entered partial summary judgment granting declaratory judgment as to the First and Second Causes of Action. The judgment of December 29, 1975, was appealed, and the United States Court of Appeals for the Fifth Circuit affirmed in part, and vacated in part, 566 F.2d 1213 (5th Cir. 1977).

Carlough, Doby, Hinkle, SMWIA, and Local 441, on May 10, 1978 renewed their motion for summary judgment as to the Fourth, Fifth, and Seventh Causes of Action, in light of the decision of the Fifth Circuit on appeal, 556 F.2d 1213 (5th Cir. 1977). Oral argument was heard on May 26, 1978. After due consideration of the pleadings, depositions, answers to interrogatories, affidavits, testimony at the October 8, 1974 hearing on preliminary injunction, testimony at the October 15, 1974 hearing on the contempt petition of MMCA, and the testimony presented by the Union Defendants at the March 21, 1975 argument on summary judgment, exhibits in evidence, and having heard the arguments of counsel, having considered the memoranda of law filed by counsel for both sides, and having considered the applicable law, the Court finds as follows:

## FINDINGS OF FACT

### The Parties

1. MMCA is an incorporated employer association which represented several employers in collective bargaining negotiations with defendant Sheet Metal Workers International Association Local Union No. 441 (Local 441) from July through October, 1974. A substantial part of the business of MMCA is representing employers in negotiating and administering collective bargaining agreements (PLAINTIFF'S ANSWERS TO INTERROGATORIES, Interrogatory No. 29, February 3, 1975).

2. Defendant Carlough has been at all times material hereto, the general president of SMWIA, and a trustee of SASMI.

3. Defendant Doby has been at all times material hereto, an employee and "organizer" of SMWIA and Local 441 (Testimony of Rettig, 10/8/74, T. 37–38; MMCA Ex. 21, 22, 3/21/75).

4. Defendant Hinkle has been at all times material hereto, an employee and "organizer" of SMWIA (MMCA Ex. 19, 20, 21, 22, 3/21/75).

5. Defendant SMWIA (a) is an unincorporated association, (b) is a labor organiza-

tion, and (c) is engaged in this judicial district in representing employees in the construction industry.

6. Defendant Local 441(a) is an unincorporated association, (b) is a labor organization, and (c) is engaged in this judicial district in representing employees in the construction industry.

### Others Involved

7. Air Conditioning Engineers, Inc. (a) is engaged in the construction industry, and (b) designated MMCA as its representative for the purposes of 1974 collective bargaining with Local 441.

8. Climatic Engineers, Incorporated (a) is engaged in the construction industry, and (b) designated MMCA as its representative for the purposes of 1974 collective bargaining with Local 441.

9. Coast Corporation (a) is engaged in the construction industry, and (b) designated MMCA as its representative for the purposes of 1974 collective bargaining with Local 441.

10. Mobile Refrigeration Company (a) is engaged in the construction industry, and (b) designated MMCA as its representative for the purposes of 1974 collective bargaining with Local 441.

### THE SASMI 1973 TRUST AGREEMENT

11. The SASMI 1973 Trust Agreement (MMCA Ex. 1, 10/8/74) was, according to the declaration of trust, executed in "San Fransico [sic], California" on May 21, 1973 by Carlough for SMWIA and Charles Andrews who signed the declaration separately as "President, Sheet Metal Contractors Association of San Fransico [sic], Inc." and separately as "President, Valley Sheet Metal Co., Inc."

### The SASMI Trustee Selection Procedure

12. According to the SASMI 1973 Trust Agreement, on May 21, 1973, Carlough on behalf of SMWIA appointed himself the

"Union Trustee" of SASMI under the SAS-MI 1973 Trust Agreement.

13. According to the SASMI 1973 Trust Agreement, Charles Andrews, without any indication of the capacity in which he acted, appointed McKenzie the "Employer Trustee" under the SASMI 1973 Trust Agreement.

14. The signatures on the acceptance of the Trustees are attached to the SASMI 1973 Trust Agreement in the following manner:

ACCEPTANCE

We, the undersigned, do hereby agree to serve as Trustees in accordance with said Trust Agreement. We have read the said Trust Agreement, fully understand the contents thereof and agree to comply with all its terms and provisions.

FOR UNION:

Name s/ Edward J. Carlough
Position: General President
Address: 1750 New York Ave., N.W.
Washington, D.C. 20006

Name _____
Position: _____
Address: _____

Name _____
Position: _____
Address: _____

FOR EMPLOYER:

Name s/ A. Bruce McKenzie
Position _____
Address: 147 Tiburon Blvd.
San Rafael, California 94901

Name _____
Position: _____
Address: _____

Name _____
Position: _____
Address: _____

15. On May 21, 1973, Charles Andrews, President of Valley Sheet Metal Co. and the Sheet Metal Contractors Association of San Francisco, and Carlough executed the SAS-MI 1973 Trust Agreement. Andrews appointed McKenzie as the employer trustee of SASMI to represent the Sheet Metal Contractors Association of San Francisco at a national level in the administration of SASMI (Deposition of Charles Andrews, p. 14, lines 8–25).

16. Andrews executed the SASMI Trust Agreement in consideration of certain promised economic concessions from Carlough, the SMWIA, and Sheet Metal Workers International Association Local Union No. 104 (MMCA Ex. 3–6, 12, 3/21/75).

17. Valley Sheet Metal Co. (Andrews' company) and the Sheet Metal Contractors Association of San Francisco agreed conditionally to pay money to SASMI in the future; an escrow account was established at the Wells Fargo Bank in San Francisco, to which some payments were made. The conditions precedent under the escrow agreement for payments to SASMI were not met. By letter dated December 24, 1974, McKenzie, as Executive Manager of the Sheet Metal Contractors Association of San Francisco, and Edward F. Kenny as Business Manager of Sheet Metal Workers International Association Local Union No. 104 advised SASMI Administrator John R. Falvella:

Please be advised that the Collective Bargaining Agreement between Local 104 SMWIA and the Sheet Metal Contractors Association of San Francisco does *not* contain any provisions for the incorporation of the 'SASMI' program.

The conditional arrangements for such participation were not met and any contributions received by the SASMI Fund were therefore premature and voluntary to assist possible administrative data processing. (MMCA Ex. 34, p. 2, 3/21/75).

The funds paid to the escrow account were to be returned to the contractors, including Valley Sheet Metal Co. (MMCA Ex. 34, 3/21/75; Ex. 25, 29 to Deposition of John R. Falvella; Deposition of Alexander Bruce McKenzie, p. 80, line 25 to p. 81, line 12;

318

Deposition of Charles Andrews, p. 7, line 3 to p. 8, line 1; p. 17, lines 12–13).

18. On May 21, 1973, and subsequently, neither Andrews, Valley Sheet Metal Co., nor Sheet Metal Contractors Association of San Francisco was or has been an employer within the meaning of the SASMI 1973 Trust Agreement which provides in Article I, Section 1:

The term 'Employers' as used herein shall mean any Employer in the Sheet Metal Industry who now or hereafter has or is operating under a collective bargaining agreement with a Local Union requiring periodic contributions to the National SASMI fund created by this Trust Agreement and any amendments or modifications thereof; . . . (MMCA Ex. 1, 10/8/74).

19. SASMI appears to have claimed that certain sums were due from one or more contractors represented by the Sheet Metal Contractors Association of San Francisco to SASMI. From the record it does not appear that any such disputed payments, if made, have been credited to employees pursuant to the terms of the SASMI 1973 Trust Agreement. Such payments were not made by "employers" within the meaning of the SASMI 1973 Trust Agreement, who are defined as "operating under a collective bargaining agreement with the Local Union requiring periodic contributions to the National SASMI Fund . . ." within the meaning of Article I, Section 1 of the SASMI 1973 Trust Agreement (MMCA Ex. 1, 10/8/74), because the Collective Bargaining Agreement between Local 104 SMWIA and the Sheet Metal Contractors Association of San Francisco did not contain any unconditional provisions for the incorporation of the "SASMI" program, and the conditional arrangements for such participation were not met (MMCA Ex. 34, 3/21/75).

20. Carlough and SMWIA offered the opportunity to select the first Employer Trustee of SASMI first to SMACNA (MMCA Ex. 1, 3/21/75), and then to Charles Andrews, who was president of the Sheet Metal Contractors Association of San Francisco. Carlough and SMWIA therefore

exercised control over the selection of the SASMI Employer Trustee by choosing the persons entitled to select the SASMI Employer Trustee. McKenzie subsequently appointed another SASMI Employer Trustee, James McGill. McGill was suggested to McKenzie by Carlough (Deposition of McKenzie, p. 94, lines 11–27) and McGill himself wrote to thank Carlough for his selection as a SASMI Employer Trustee (Ex. 7 to Deposition of McKenzie).

21. The SASMI 1973 Trust Agreement established different methods for the selection and removal of Employer Trustees than the SASMI 1973 Trust Agreement established for the selection and removal of Union Trustees. The General President of SMWIA had a continuing right under the SASMI 1973 Trust Agreement to remove and replace Union Trustees; no employer or group of employers had an equivalent right to remove and replace Employer Trustees. The SASMI 1973 Trust Agreement in Article III, Section 4, provides that the Employer Trustee was appointed for life, not removable by any employer or group of employers, and retained the sole power to choose his successor; the Union Trustee, on the other hand, was appointed by the General President of the SMWIA, could be removed at will by the General President of the SMWIA, and would be replaced by the General President of the SMWIA. That is, the SMWIA, through its General President, had a right of recall and a right of replacement of its Union Trustee which right was afforded to no employer or group of employers. Such a right of recall and replacement in the hands of the SMWIA gave it continuing, complete control over the Union Trustee, but no employer or group of employers had such control over the Employer Trustee.

22. Under Article III, Section 1, of the SASMI 1973 Trust Agreement, the number of Union Trustees and Employer Trustees was required to be equal at all times. The General President of SMWIA could have prevented the appointment of any further Employer Trustees by refusing an increase in the number of Union Trustees.

23. Under the SASMI 1973 Trust Instrument, MMCA could never participate in the selection of Employer Trustees, while SMWIA retained the right to remove and select Union Trustees at any time and from time to time.

24. The SASMI plan also allows local unions to perform numerous administrative functions such as distribution of benefit applications (Article VIII, Section 1(a) Defendants' Ex. 2, p. 53, 10/8/74) and distribution of benefit checks to employees (Article V, Section 4, Defendants' Ex. 2, p. 51, 10/8/74). Each benefit application requires certain "local union data: (to be completed by union official only)" (Ex. 43 to Deposition of McGill); "SASMI BENEFIT APPLICATION PROCEDURES" (Ex. 44 to Deposition of McGill) provides that all benefit application details, correspondence and questions shall be handled between the SASMI fund office and the local union, not the applicant, and local union officials are empowered "to eliminate benefit application requests which would be erroneously filed."

25. The local unions of SMWIA which have collective bargaining agreements giving SASMI payments are extensively involved at a local level in the administration of SASMI, but there is no similar or coordinate participation by local employer associations in such administration of SASMI.

26. The SASMI 1973 Trust Agreement failed to provide for equal representation of employers and employees in the administration of SASMI.

### The SASMI "Special Incentive Benefit"

27. The attachments to the SASMI 1973 Trust Agreement which were supplied by A. Bruce McKenzie (Ex. 29 to the Deposition of McKenzie; Deposition of McKenzie, p. 53, 55–56) and identified by Charles Andrews (Ex. 8 to Deposition of Andrews; Deposition of Andrews, p. 40), provide for payment of a "special incentive benefit" to employees who are participants in SASMI and who have been fully employed (MMCA Ex. 4, 10/8/74). The "special incentive benefit" is not an unemployment benefit, nor is it reasonably related to an unemployment benefit, because it is payable only to employees who are fully employed.

### SASMI Payments to SMWIA

28. SASMI trustees, including Carlough, on July 2, 1974, paid $125,000 as "reimbursement" to SMWIA. (Response of Geoffrey Clasper on behalf of defendant Edward J. Carlough to first set of interrogatories propounded by Mobile Mechanical Contractors Association, Inc., Interrogatory No. 3, 5/1/78).

29. As of July 2, 1974, SMWIA had made payment to SASMI in the amount of $10,000, and SMWIA had made payments which SMWIA attributes to have been for the benefit of the SASMI Trust Fund or the SASMI Trustees, totaling $109,159.09, as follows (Response of Geoffrey Clasper on behalf of defendant Edward J. Carlough to first set of interrogatories propounded by Mobile Mechanical Contractors Association, Inc., Interrogatory Nos. 1 and 2):

| To Whom | Date | Amount | Purpose |
| --- | --- | --- | --- |
| Mulholland, Hickey, Lyman | 7/73 thru 12/73 | $22,900.00 | Legal Services |
| Arnold & Porter | 12/7/73 | 1,750.00 | Special Legal Tax Services |
| Stanley Ruttenberg & Associates | 11/26/73 9/12/73 | 5,450.00 1,762.35 | Opinion Survey Cost of Living Council Submission on behalf of SASMI |
| Martin E. Segal " " " " " " | 11/29/72 1/5/73 5/24/73 | 20,000.00 1,620.53 560.59 | Development of SASMI Trust Agreement and Plan |

| To Whom | Date | Amount | Purpose |
|---|---|---|---|
| Maurer, Fleisher | 8/7/73 | 24,446.18 | Development of Pamphlets |
| & Zon | 5/14/74 | 1,369.48 | and other material |
| | | | explaining SASMI |
| Advertising Novelty | 5/23/74 | 3,042.86 | Manufacture of SASMI |
| Co. | | | Identification Buttons |
| Merkle Press, Inc. | 12/19/73 | 202.65 | Designing SASMI Seal |
| "    "    " | 11/21/73 | 4,813.36 | Printing Remittance Reports |
| "    "    " | 9/20/73 | 6,156.20 | Printing SASMI Booklets, |
| "    "    " | 4/24/73 | 2,978.58 | "A Plan for Stabilizing |
| "    "    " | 3/26/73 | 2,254.98 | the Sheet Metal Industry" |
| "    "    " | 5/17/73 | 3,110.33 | |
| "    "    " | 1/31/74 | 3,370.50 | |
| "    "    " | 2/28/74 | 3,370.50 | |
| Total as of July 2, 1974: | | $109,159.09 | |

30. SASMI, on July 2, 1974, paid SMWIA $5,840.91 more than SMWIA's accounts showed that SMWIA had paid to, or for the benefit of, SASMI at that time.

31. Subsequently, SMWIA paid $962.75 to Merkle Press, Inc., on July 19, 1974 (Response of Geoffrey Clasper on behalf of defendant Edward J. Carlough to first set of interrogatories propounded by Mobile Mechanical Contractors Association, Inc., Interrogatory No. 2).

32. On September 11, 1975, more than one year after SASMI paid $125,000 to SMWIA, SMWIA repaid SASMI the sum of $4,878.16 (Response of Geoffrey Clasper on behalf of defendant Edward J. Carlough to first set of interrogatories propounded by Mobile Mechanical Contractors Association, Inc., Interrogatory No. 1, 5/1/78).

*Article X, Section 8, of the SMWIA "Standard Form Of Union Agreement"*

33. Participation in SASMI requires that employers agree to be bound by the SMWIA "Standard Form of Union Agreement." (Testimony of James S. Phillips, 10/8/74, T. 143–44) The SASMI 1973 Trust Agreement provides in part in Article I, Section 1:

. . . that no employer may be eligible for initial or continued participation in the National SASMI Fund unless it is a party to the Standard Form of Union Agreement . . . (MMCA Ex. 1, 10/8/74).

34. An explanatory pamphlet furnished to MMCA by Sheet Metal Workers Local 441, MMCA Ex. 4, 10/8/74, contained questions and answers concerning SASMI including the following:

Q. Is the Standard Form of Union Agreement required under the SASMI program?

A. Yes. The SASMI plan requires the adoption of the entire Standard Form of Union Agreement, including Article X.

By letter dated May 28, 1974, to James McGill (Ex. 84 to Deposition of James McGill), defendant Carlough identified as one of the "hard requirements that the International had in SASMI, . . . the use of Article X, Section 8 to settle disputes . . . ."

C. A. Rettig, Business Manager and negotiator for Local 441, also stated during negotiations that Article X, Section 8, was a condition of SASMI (See the Deposition of C. R. Carroll, p. 85, line 22—p. 86, line 4:

It was brought out in several of the meetings about Article X, Section 8. We were, of course, opposed to that and wanted to work around that and, of course, Mr. Rettig said, "No, we had to get that in because they had to have that in there before the SASMI program."

So, that was verbal as well as written in the book.)

35. The "Standard Form of Union Agreement", MMCA Ex. 33, 10/8/74, includes in Article X, Section 8, the following provision:

(a) Should the negotiations for renewal of this agreement become deadlocked in the opinion of the Local Union or of the Local Contractors' Association, or both, notice to that effect shall be given to the office of the General President of Sheet Metal Workers' International Association and the national office of the Sheet Metal and Air Conditioning Contractors' National Association, Inc. If the General President of Sheet Metal Workers' International Association and the Chairman of the Labor Committee of Sheet Metal and Air Conditioning Contractors' National Association, believe the dispute might be adjusted without going to final hearing before the National Joint Adjustment Board, each will then designate a panel representative who shall proceed to the locale where the dispute exists as soon as convenient, attempt to conciliate the differences between the parties and bring about a mutually acceptable agreement. If such panel representatives or either of them conclude that they can not resolve the dispute, the parties thereto and the General President of Sheet Metal Workers' International Association and the national office of Sheet Metal and Air Conditioning Contractors' National Association shall be promptly so notified without recommendation from the panel representatives. Should the President of Sheet Metal Workers' International Association or the Chairman of the Labor Committee of Sheet Metal and Air Conditioning Contractors' National Association fail or decline to appoint a panel member or should notice of failure of the panel representatives to resolve the dispute be given, the parties shall promptly be notified so that either party may submit the dispute to the National Joint Adjustment Board.

The dispute shall be submitted to the National Joint Adjustment Board pursuant to the rules as established and modified from time to time by the National Joint Adjustment Board. The unanimous decision of said Board shall be final and binding upon the parties, reduced to writing, signed and mailed to the parties as soon as possible after the decision has been reached. There shall be no cessation of work by strike or lockout unless and until said Board fails to reach a unanimous decision and the parties have received written notification of its failure.

(b) Any application to the National Joint Adjustment Board shall be upon forms prepared for that purpose subject to any changes which may be decided by the Board from time to time. The representatives of the parties who appear at the hearing will be given the opportunity to present oral argument and to answer any questions raised by members of the Board. Any briefs filed by either party including copies of pertinent exhibits will also be exchanged between the parties in advance of the hearing.

(c) The National Joint Adjustment Board shall have the right to establish time limits which must be met with respect to each and every step or procedure contained in this section. In addition, the President of SMWIA and the Chairman of the National Labor Committee of SMACNA shall have the right to designate time limits which will be applicable to any particular case and any step therein which may be communicated to the parties by mail, telegram, or telephone notification.

(d) Unless a different date is agreed upon mutually between the parties or is directed by the unanimous decision of the National Joint Adjustment Board, all effective dates in the new agreement shall be retroactive to the date immediately following the expiration date of the expiring agreement.

36. Article X, Section 8, of the "Standard Form of Union Agreement", MMCA Exhibit 33, 10/8/74, provides that new contract terms may be fixed by agreement of the National Joint Adjustment Board, consisting of representatives of defendant SMWIA and of SMACNA. *See N.L.R.B. v.*

*Sheet Metal Workers, Local 38*, 575 F.2d 394 (2d Cir. 1978), discussing Article X, Section 8.

37. MMCA is not affiliated with SMAC-NA (Deposition of SMACNA Executive Vice President Ronald E. Van Gelderen, p. 143; Deposition of C. R. Carroll, p. 113; Deposition of Bradley Donaghey, p. 17).

### Bargaining Demands for SASMI

38. Carlough and SMWIA adopted SASMI as a "priority bargaining target" for all local unions of SMWIA, including Local 441. Carlough, by correspondence (MMCA Ex. 6, 7, 10/8/74; MMCA Ex. 8, 10, 11, 3/21/75) and through his agents including International Representative Tom Reed (MMCA Ex. 2, 15, 17, 3/21/75) and defendants Hinkle and Doby, who were SMWIA "organizers" (MMCA Ex. 19, 20, 21, 22, 3/21/75), encouraged and caused Local 441 to insist upon SASMI in 1974 negotiations with MMCA. In connection with the demand for SASMI, Carlough and SMWIA also encourage SMWIA local unions, including Local 441, to sign "interim agreements" with "independent contractors" to obtain "a very strong union weapon in strike situations" (MMCA Ex. 6, 10/8/74). The "interim agreement" suggested by Carlough and SMWIA, provided that the signatory employers agree to accept, retroactively, whatever contract terms a particular contractors' association ultimately agrees to (MMCA Ex. 6, 10/8/74).

39. Air Conditioning Engineers, Inc., Climatic Engineers, Incorporated, Coast Corporation, and Mobile Refrigeration Company and other employers represented by MMCA for the purpose of bargaining with Local 441, were parties to a collective bargaining agreement which became effective on July 16, 1972 and which provides that it will "remain in full force and effect through July 15, 1974 . . . unless written notice of reopening is given" and provides that "this Agreement shall continue in force and effect until conferences relating thereto have been terminated by either party."

40. Local 441 gave timely notice on reopening.

41. Conferences between the collective bargaining committees of MMCA and Local 441 commenced on June 17, 1974, and continued on several occasions thereafter until agreement was reached on October 16, 1974.

42. The members of Local 441 did not, prior to entry of preliminary injunction on October 11, 1974, have an opportunity to vote as to whether they desired SASMI to be included in their collective bargaining agreement, and there is no evidence that the demand for SASMI was ever presented to the membership of Local 441 for a vote. The demand for SASMI was withdrawn by a letter from C. A. Rettig of Local 441 to the President of MMCA dated October 14, 1974 (Local 441, Ex. 1, 10/15/74), after the preliminary injunction issued October 11, 1974, and at the time of explicit instructions from Carlough to withdraw SASMI conveyed by telegram (Testimony of Rettig, 10/15/74, T. 27, 29–30; International Union Ex. 1, 10/15/74).

43. Local 441 from June 17, 1974 until after preliminary injunction issued on October 11, 1974, demanded that employers represented by MMCA agree to contribute money to SASMI as a prerequisite to a new collective bargaining agreement to become effective as of July 16, 1974, between Local 441 and MMCA.

44. Local 441 from June 17, 1974 until after preliminary injunction issued on October 11, 1974, demanded that MMCA appoint McKenzie as the Trustee for MMCA under the SASMI 1973 Trust Agreement.

45. On July 16, 1974, Carlough, C. A. Rettig, Doby, Hinkle, John R. Falvella (a defendant dismissed from this action on July 21, 1975), SMWIA and Sheet Metal Workers Local 441, caused employees represented by Local 441 to commence a strike against Air Conditioning Engineers, Inc., Climatic Engineers, Incorporated, Coast Corporation, and Mobile Refrigeration Company and other employers (MMCA Ex. 6, 10/8/74). Carlough and SMWIA encouraged and assisted the strike for SASMI by correspondence (Testimony of Rettig, 10/8/74, T. 39–40), by payments of money (Testimony of Rettig, 10/8/74, T. 37), and

by the direct involvement of SMWIA organizers Doby and Hinkle, who reported to SMWIA (MMCA Ex. 19, 20, 21, 22, 3/21/75), and were under the direction and supervision of Carlough (SMWIA Constitution and Ritual, Article Eight (8), Sec. 3, Ex. 1 to Affidavit of Conrad A. Rettig, March 7, 1975).

46. The strike of Local 441 which commenced on July 16, 1974, continued until agreement was reached on a new contract on October 16, 1974 (See Affidavit of Conrad A. Rettig, March 7, 1975).

47. Counsel stipulated, and the Court finds, that an object of the strike by Local 441 from its inception until after preliminary injunction issued on October 11, 1974, was to force and require employers represented by MMCA and other employers, to agree to participate in SASMI (Stipulations of Counsel, T. 12–13, 10/8/74).

48. Participation in SASMI by employers represented by MMCA and other employers required (a) agreement to pay money to SASMI, and (b) appointment of McKenzie as the trustee of such employers under the SASMI 1973 Trust Agreement.

49. C. A. Rettig, Business Manager of Local 441, saw a copy of the executed 1973 Trust Agreement establishing SASMI for the first time, while on the witness stand on October 8, 1974; this copy was incomplete in that it did not have the attachments referred to therein.

50. MMCA was injured by the strike and repeated demands for SASMI, and efforts to induce employers represented by MMCA to withdraw and terminate their association with MMCA by executing interim "retroactive" agreements with Local 441 (Testimony of Max Mutchnick, 10/8/74, T. 118, 123–124; MMCA Ex. 22, 23, 24, 26, 27, 32, 10/8/74). The demand for SASMI as a condition of any agreement between MMCA and Local 441, together with the lawful resistance of MMCA to that demand, resulted in a lengthy strike during which at least two employers, James B. Donaghey, Inc. and Air Comfort Company, withdrew from representation by MMCA (Testimony of Mutchnick, 10/8/74, T. 118, 123–24; Testimony of Rettig, 10/15/74, T. 39).

51. MMCA incurred legal fees in its efforts to end the strike and to resist the demand for SASMI made by Local 441.

52. MMCA was impeded in its lawful business of negotiating on behalf of employers by the action of Carlough and SMWIA in causing and directing the strike for SASMI, and continued insistence that MMCA agree to SASMI in 1974 collective bargaining negotiations.

53. The 1974 strike by Local 441 caused a curtailment of the operations of Air Conditioning Engineers, Inc., Climatic Engineers, Incorporated, Coast Corporation, Mobile Refrigeration Company and other employers in the states of Alabama, Florida and Mississippi; caused Air Conditioning Engineers, Inc., Climatic Engineers, Incorporation, Coast Corporation, and Mobile Refrigeration Company and other employers immediate and irreparable injuries, loss and damages.

54. It was the intention of Carlough and SMWIA to impose SASMI on an industry-wide basis (MMCA Ex. 6, 10/8/74); and counsel for SASMI represented to the Internal Revenue Service in MMCA Ex. 14, 3/21/75, that SASMI will eventually encompass the entire unionized sheet metal industry:

> The [SASMI] plan has already been inaugurated in May of this year [1973], and will ultimately encompass the entire union-organized part of the sheet metal industry in which approximately 100,000 individuals are employed.

55. SMWIA and Carlough have encouraged and caused local unions of SMWIA, including Local 441, to insist that sheet metal industry employers agree to SASMI on an industry-wide basis (MMCA Ex. 7, p. 3, 10/8/74; MMCA Ex. 2, 8, 9, 10, 11, 13, 14, 17, 18, 19, 23, 24, 25, 26, 27, 28, 3/21/75).

## CONCLUSIONS OF LAW

### The Federal Damage Claim Contained In The Third Cause Of Action

1. The Third Cause of Action seeks damages from Carlough and SMWIA for violation of Section 302.

2. This court has no jurisdiction of the Third Cause of Action under Subsection 302(e), in accordance with the decision of the Fifth Circuit on prior appeal of this case. *Mobile Mechanical Contractors Ass'n, Inc. v. Carlough*, 566 F.2d 1213, 1220 (5th Cir. 1977).

3. The Fifth Circuit did not decide whether this court has jurisdiction of the Third Cause of Action under 28 U.S.C. § 1337, but that Court did note that such jurisdiction may, in this Court's discretion, be invoked. 566 F.2d at 1220. 28 U.S.C. § 1337 confers original jurisdiction on the United States district courts of actions "arising under" laws of the United States regulating commerce.

4. Section 302 of the LMRA is a law of the United States regulating commerce within the meaning of 28 U.S.C. § 1337. *Moglia v. Geoghegan*, 403 F.2d 110, 112 (2d Cir. 1968), *cert. denied*, 394 U.S. 919, 89 S.Ct. 1193, 22 L.Ed.2d 453 (1969). *See also Avco Corp. v. Aero Lodge 735, IAM*, 390 U.S. 557, 561–62, 88 S.Ct. 1235, 1238, 20 L.Ed.2d 126 (1968).

5. MMCA is an association of employers within the meaning of Section 302 and is entitled to sue under Section 303 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 187.

6. Defendant Carlough is a representative of employees within the meaning of Section 302 and is an agent of SMWIA, a labor organization within the meaning of Section 2(5) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(5).

7. Defendant SMWIA is a labor organization within the meaning of Section 2(5) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(5); is engaged in this judicial district in representing employees in an industry affecting commerce as defined in Section 2(7) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(7); and is a representative of employees within the meaning of Section 302.

8. Defendant Local 441 is a labor organization within the meaning of Section 2(5) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(5); is engaged in this judicial district in representing employees in an industry affecting commerce as defined in Section 2(7) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(7); and is a representative of employees within the meaning of Section 302.

9. Air Conditioning Engineers, Inc. is an employer within the meaning of Section 302; is engaged in commerce within the meaning of Section 2(6) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(6); and is engaged in an industry affecting commerce within the meaning of Section 2(7) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(7).

10. Climatic Engineers, Incorporated is an employer within the meaning of Section 302; is engaged in commerce within the meaning of Section 2(6) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(6); and is engaged in an industry affecting commerce within the meaning of Section 2(7) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(7).

11. Coast Corporation is an employer within the meaning of Section 302; is engaged in commerce within the meaning of Section 2(6) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(6); and is engaged in an industry affecting commerce within the meaning of Section 2(7) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(7).

12. Mobile Refrigeration Company is an employer within the meaning of Section 302; is engaged in commerce within the meaning of Section 2(6) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(6); and is engaged in an industry affecting commerce within the meaning of Section 2(7) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(7).

13. The employees of Air Conditioning Engineers, Inc., Climatic Engineers, Incorporated, Coast Corporation and Mobile Refrigeration Company and other employers represented by MMCA for the purpose of bargaining with Sheet Metal Workers Local 441, are employed in an industry affecting

commerce within the meaning of Section 302 and Section 2(7) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(7).

14. SASMI is a representative of employees who are employed in an industry affecting commerce within the meaning of Section 302, and is administered at least in part by Union Trustees who are representatives of employees who are employed in an industry affecting commerce within the meaning of Section 302. *Local 2, Plasterers v. Paramount Plastering, Inc.*, 310 F.2d 179 (9th Cir. 1962), *cert. denied* 372 U.S. 944, 83 S.Ct. 935, 9 L.Ed.2d 969 (1963).

### SASMI Violation Of The Equal Representation Requirement

■ 15. From its inception through October 16, 1974, SASMI did not satisfy the equal representation requirement of Subsection 302(c), in that employers were not equally represented in the administration of SASMI. Carlough and SMWIA participated to an impermissible degree in the selection of employer representatives, by allowing Andrews to appoint McKenzie irrevocably and subsequently offering potential contributing employers only the opportunity to forego representation by accepting irrevocably McKenzie as the SASMI "Employer" Trustee. Carlough and SMWIA thus chose the person entitled to choose the SASMI Employer Trustee. The equal representation requirement of Section 302 would be meaningless if a union were entitled to select certain noncontributors to irrevocably choose the Employer Trustee while the employers who actually make contributions to such fund were represented only by irrevocably designating the incumbent Employer Trustee appointed by a noncontributor.

16. The purposes of Section 302 were well stated in *Bricklayers Local 15 v. Stuart Plastering Co., Inc.*, 512 F.2d 1024 (5th Cir. 1975):

The design of Section 302 discloses two basic Congressional concerns. First, Congress intended to subject to close regulation the administration of union funds providing employee fringe benefits such as pensions and health and welfare payments. Congress wished to remove these funds from the absolute control of union officials by giving employers a co-ordinate responsibility for their administration. Second, Congress intended to prohibit special payments by employers and employer associations to employees, employee organizations, and officers of such organizations, except on conditions carefully prescribed by law [footnotes omitted].

■ 17. The legislative history of the Labor Management Relations Act of 1947 demonstrates an intention that employers have and exercise co-ordinate responsibility in administration of the funds to which they contribute. Senator Taft stated:

This amendment [Section 302] provides that the employees and employers must be equally represented in the administration of the fund, together with such neutral persons as they may agree upon. In the event of a deadlock the agreement shall be submitted to an impartial umpire.

The purpose is to prevent the abuse of welfare funds. Legislative History of the Labor Management Relations Act, 1947, Volume 2, at 1312 (1948), (hereafter cited II Leg.His. ——.)

18. Opponents of Section 302 explicitly recognized the responsibility of employers. Senator Murray stated:

. . . this amendment is designed to *compel joint administration by the union and the employer of any health and welfare fund voluntarily established between the parties* for the benefit of the employees (emphasis supplied) II Leg.His. 1316 (1948).

Senator Morse stated:

. . . employees and employers must be equally represented in the administration of the fund, and in the event of disagreement between them, machinery is provided for the settling of such disputes. In other words, it *requires employer participation* in the funds and in

the administration of the funds (emphasis supplied) II Leg.His. 1317, 1318 (1948).

19. As Professor Archibald Cox wrote of the restrictions imposed on trust funds by Section 302, "the provisions dealing with employer contributions to union trust funds set the employer up as watchdog, although it has no interest in the fund." Cox, *Some Aspects of the Labor Management Relations Act*, 61 Harv.L.Rev. 274, 314 (1948).

■ 20. The nature of representation contemplated by Congress in enacting Section 302 was the exercise of oversight by representatives of employers to prevent the abuse that would be possible if funds were left to union control. *See Arroyo v. United States*, 359 U.S. 419, 426, 79 S.Ct. 864, 868, 3 L.Ed.2d 915 (1959).

■ 21. MMCA would not have been represented in any meaningful sense in the administration of SASMI. The responsibility of MMCA to oversee the administration of jointly administered employee welfare benefit funds to which it contributes, would not have been met by designating irrevocably McKenzie as the SASMI Employer Trustee. To do so would be to allow Carlough and SMWIA to dictate the SASMI Employer Trustee selection of MMCA. To allow the union to participate in any degree in the selection of employer trustees is unlawful under Section 302. *Blassie v. Kroger Co.*, 345 F.2d 58, 72 (8th Cir. 1965); *Quad City Builders Association v. Tri City Bricklayers Union No. 7, AFL–CIO*, 431 F.2d 999, 1003 (8th Cir. 1970).

22. The intent of Section 302 is not served if any contributing employer is deprived of representation in the administration of funds to which it contributes. As Justice (then Judge) Blackmun wrote in *Blassie, supra* at 72:

The whole contemplation of the statute [Section 302] *is that the employers who are entitled to representation in the administration of the fund are those who make their contributions because of their subjectability to collective bargaining with the union as a union.* If others not in this category choose to contribute

[such as the union on behalf of its employees or the trust on behalf of its employees], they take their representation as they find it. Further, *to permit the union in any degree to participate in the choice of employer representative does violence to the statutory standard of equal representation* [emphasis supplied].

■ 23. Carlough and SASMI granted the right to select the SASMI Employer Trustee, McKenzie, to a noncontributor and subsequently insisted that potential contributing employers such as MMCA agree to designate irrevocably the SASMI Employer Trustee selected by noncontributors. Carlough participated in the selection of McGill as a SASMI Employer Trustee. To permit a union to select which employers are entitled to representation in the administration of an employee benefit plan, and which employers are not entitled to representation violates Section 302, because the union thereby participates to an impermissible degree in the selection of employer trustees by choosing the choosers of the trustees. Moreover, participation by Carlough in the selection of McGill as a SASMI Employer Trustee also violated Section 302.

24. The SMWIA, through its general president, had the continuing right to remove and replace the SASMI Union Trustee, although no employer had the right to remove or replace the SASMI Employer Trustee.

■ 25. The right of recall of the Union Trustee which is not matched by the same right of recall as to the Employer Trustee does not provide equal representation of employers and employees in the administration of SASMI. *See Kroger Co. v. Blassie*, 225 F.Supp. 300 (D.C.Mo.1964), *vacated and remanded with directions on other grounds*, 345 F.2d 58 (8th Cir. 1965), which disapproved a provision for alternate trustees for employees without making similar provision for alternate trustees for employers. That court

would have required that the same standards with respect to alternate trustees must apply to both sets of trustees, as the

Act provides in the representation of employers and employees with respect to the operation of the trust shall be equal. The court would also have required the removal provision regarding employer trustees [that the removal of employer trustees could be only for substantial cause] be deleted.

225 F.Supp. at 312.

26. The same rules must apply to both sets of trustees, and under the SASMI 1973 Trust Agreement they clearly do not.

27. The extensive delegation of administrative functions concerning forms, applications, and other information (in connection with SASMI) to local unions of SMWIA, without coordinate participation by representatives of local employer associations violates Section 302(c)(5)(B), in that employers are not equally represented in the administration of the Fund on the local level. The equal representation requirement of Section 302 is not satisfied simply by equal numbers of employer and employee trustees, as the Fifth Circuit stated in *Costello v. Lipsitz,* 547 F.2d 1267, 1278 (5th Cir. 1977):

> . . . Although we wish to emphasize that none of the flagrant, impermissible abuses which gave birth to § 302 have occurred in this case, our decision is based upon the recognition that § 302 would be eviscerated should the phrase 'employees and employers are equally represented in the administration of such fund' connotate *only* the requirement that employees and employers have equal numbers of trustees, three each in this case, or representatives, [emphasis in original] [footnote omitted].

The reasoning of *Costello v. Lipsitz* that one group of trustees could not lawfully have sole control of any element of fund administration (in that case, sole control of fund employee hiring and compensation) is applicable to exclusive local union participation in certain SASMI administrative matters without equal representation of local employer associations.

*SASMI Unlawful Benefits*

28. Section 302 permits jointly administered trust funds to be organized only for purposes recognized in the statutory exceptions of Subsection 302(c). *Local 2, Plasterers v. Paramount Plastering, Inc.,* 310 F.2d 179 (9th Cir. 1962), *cert. denied* 372 U.S. 944, 83 S.Ct. 935, 9 L.Ed.2d 969 (1963). Strict compliance with the terms of Section 302(c) is required to establish a qualifying trust. *Bricklayers Local 15 v. Stuart Plastering Co., Inc.,* 512 F.2d 1017 (5th Cir. 1975). The SASMI "special incentive benefit" is a type of payment not permitted by Subsection 302(c). The types of benefits which may be paid by trust funds established under Subsection 302(c) are narrowly limited, and include "unemployment" benefits. While most of the SASMI benefits appear to be "unemployment" benefits, the "special incentive benefit" is paid only to persons relatively fully employed, and is therefore not an unemployment benefit. The SASMI "special incentive benefit" is not a permissible benefit under Subsection 302(c), and SASMI therefore does not comply with Subsection 302(c).

*Unlawful Payment To SMWIA By SASMI*

29. Section 302 prohibits payments to representatives of employees, such as SMWIA, and likewise prohibits the use of trust funds to make payments to representatives of employees which would violate Section 302 if made directly. *See Haley v. Palatnik,* 509 F.2d 1038, 1042 (2d Cir. 1975). SASMI violated Section 302 by unlawfully paying $125,000 to SMWIA on July 2, 1974, which exceeded by $5,840.91 the total payments as of that date claimed by or arguably owed to SMWIA which SMWIA attributed to be for the benefit of SASMI. Without deciding whether payment by SASMI to SMWIA of all or any part of the SMWIA expenditures (which SMWIA attributed to be for the benefit of SASMI) was lawful, the *overpayment* of $5,840.91 was clearly unlawful. The subsequent repayment, almost one year after this suit was filed, did not retroactively cure the defect which existed from July 2, 1974 through October 16, 1974.

**328**

30. Carlough, Doby, Hinkle, SMWIA and Local 441, since on or before July 15, 1974, have acted individually and in concert to demand that MMCA agree on behalf of employers represented by MMCA to make unlawful payments to SASMI in violation of Section 302. The strike in support of that demand likewise violated Section 302, and MMCA incurred damages as a result of that unlawful strike.

### 28 U.S.C. § 1337 Jurisdiction

31. The complaint, as amended, does not plead 28 U.S.C. § 1337 as a basis for jurisdiction of the Third Cause of Action. However, jurisdiction may be sustained under a statute which properly confers jurisdiction whether or not pled in the complaint. *Mumford v. Flover,* 503 F.2d 878, 882 (5th Cir. 1974); *Paynes v. Lee,* 377 F.2d 61, 63 (5th Cir. 1967).

32. Rule 15(b), of the Federal Rules of Civil Procedure, provides that a complaint may be treated as amended to conform to the evidence. *See Globe Liquor Co. v. San Roman,* 160 F.2d 800 (7th Cir. 1947); *Fifth Avenue Bank of New York v. Hammond Realty Co.,* 130 F.2d 993 (7th Cir. 1942). The substance of the claim asserted by MMCA in the Third Cause of Action is set out in a plain statement which is adequate notice to Carlough and SMWIA that MMCA asserts a claim arising under one of the laws of the United States regulating commerce. Although 28 U.S.C. § 1337 is not explicitly alleged as a basis for jurisdiction, it has been argued by counsel for MMCA that the intent of Rule 1 of the Federal Rules of Civil Procedure that the rules "be construed to secure the just, speedy, and inexpensive determination of every action" requires that this court consider whether the Third Cause of Action arises under a law of the United States regulating commerce within the meaning of 28 U.S.C. § 1337. Under Rule 54(c) of the Federal Rules of Civil Procedure, a final judgment must grant relief to which a party is entitled, even if the party has not demanded such relief in his pleadings. The complaint should be considered as if properly amended in view of the liberality in granting relief although not demanded and the free power of amendment given by Rule 54(c) and Rule 15(b). *See Downey v. Palmer,* 114 F.2d 116, 117 (2d Cir. 1940):

> To require a new action to be brought instead of permitting the pending action to go on to trial, with proper amendment of the complaint to convert the action into one for fraud, seems an unnecessary and undesirable insistence upon the original form of the plaintiff's statement of his case, which the new Rules were designed to avoid.

33. The uncontradicted evidence establishes that the Third Cause of Action *arises under* Section 302, which is "any Act of Congress regulating commerce" within the meaning of 28 U.S.C. § 1337. Therefore, this court has original jurisdiction of the Third Cause of Action under 28 U.S.C. § 1337. The Third Circuit upheld such jurisdiction under 28 U.S.C. § 1337 of an action for damages for alleged violation of Section 302 in *Nedd v. United Mine Workers,* 556 F.2d 190, 203 (3d Cir. 1977).

### The Implied Federal Damage Remedy

34. Damages may be recovered by a person injured by a violation of a federal statute, in accordance with the factors set out in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). The factors enunciated by the United States Supreme Court in *Cort v. Ash* are summarized by Justice Brennan as follows:

> In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' . . .—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? . . . And finally, is the cause of action one tradi-

tionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* at 78, 95 S.Ct. at 2088, 45 L.Ed.2d at 36.

35. MMCA is one of the class "for whose especial benefit the statute was created". *See Arroyo v. United States,* 359 U.S. 419, 425–26, 79 S.Ct. 864, 868, 3 L.Ed.2d 915 (1959). MMCA is an "association of employers", intended to be protected by Section 302 against demands for unlawful payments by representatives of employees, with standing to bring suit under Section 302. *Employing Plasterers' Assn. of Chicago v. Plasterers, Local 5,* 279 F.2d 92 (7th Cir. 1960).

36. There is a clear indication in Subsection 302(e) that civil remedies for enforcement would be recognized. Since some federal civil actions would be recognized, Congress obviously assumed that the federal courts would fashion both remedial and substantive rules of law for their disposition. Nothing in either the text of Section 302 or in its legislative history suggests any hostility to damage remedies. *Nedd v. United Mine Workers,* 556 F.2d 190, 204 (3d Cir. 1977).

37. The recognition of private enforcement is entirely consistent with the underlying legislative scheme. In contrast with the statute considered in *Cort v. Ash, supra,* Section 302 is more than a bare criminal statute. As the Third Circuit held in *Nedd v. United Mine Workers,* 556 F.2d 190, 204 (3d Cir. 1977), "[r]ecognition of an implied private action for recovery of money [for violation of Section 302] can in no way conflict with enforcement efforts entrusted to a public agency."

38. MMCA resisted, to its expense and damage, unlawful demands that MMCA agree on behalf of employers to make payments which would have violated Section 302 and sought judicial relief; these efforts by MMCA resulted in amendment of the SASMI trustee selection procedure. As the Fifth Circuit recognized in its prior opinion in this case, this court's "preliminary in-

junction . . . and its finding that the SASMI Trust Agreement violated the equal representation requirement under Section 302(c)(5)(B) obviously spurred the SASMI trustee's subsequent amendment" of the SASMI trustee selection procedure. 566 F.2d at 1216. Recognition of a cause of action for damages resulting from MMCA resistance which enforced the statute and protected MMCA and employers represented by MMCA from unlawful demands, and also protected employees of employers represented by MMCA, is consistent with the statutory purpose.

39. Recognition of a cause of action for the recovery of money for the trust (as resulted when SMWIA repaid money to SASMI on September 11, 1975) is consistent with the overall statutory purpose of Subsection 302(c)(5)—the preservation of the trust corpus for its intended beneficiaries. *Nedd, supra* at 204.

40. While the duties of fiduciaries have traditionally been a matter of concern of the states, collective bargaining agreements, at least in the private sector, have since 1947 been of federal concern. While SASMI is nominally a trust created under state law, it is a unique kind of trust, the corpus of which is the fruit of collective bargaining agreements. The very enactment of Subsection 302(c)(5) shows that Congress was not satisfied to leave protection of these bargained-for benefits entirely to the state law of trusts. *Nedd, supra* at 205.

■ MMCA is entitled to damages for its injury sustained as a result of violation of Section 302 by Carlough and SMWIA in causing Local 441 to strike employers represented by MMCA to coerce MMCA to agree on behalf of employers represented by MMCA to pay money to SASMI, which at that time violated Section 302. *Nedd, supra.*

### The State Law Damage Claims Of The Fourth And Fifth Causes Of Action

41. The Fourth and Fifth Causes of Action each present state law claims based on

the tort of wrongful interference with a lawful occupation.

42. Pendent jurisdiction to the Section 302 claim is asserted under the Fourth Cause of Action, and diversity jurisdiction under 28 U.S.C. § 1332 is asserted under the Fifth Cause of Action.

43. MMCA's damage claims based on state law must satisfy two tests: first, whether state law creates such a cause of action; second, if state law creates such a cause of action, is the cause of action preempted by federal law?

### The Merits Of The State Law Claim

■ 44. Alabama law provides a remedy to every person for injury to person or property, under the Alabama Constitution of 1901, Article I, Sec. 13, which provides in pertinent part:

. . . every person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law; . . .

The "injury" contemplated by Section 13 is the injury which arises from breach of a legal duty. *Pickett v. Matthews*, 238 Ala. 542, 545, 192 So. 261 (1939).

■ 45. Alabama law has long recognized that the "right to conduct one's business, without the wrongful and injurious interference of others, is a valuable property right." *Hardie-Tynes Mfg. Co. v. Cruse*, 189 Ala. 66, 66 So. 657, 660 (1914). The tort of interference with a lawful business survives, and is applicable in labor disputes. *International Union, UAW v. Russell*, 264 Ala. 456, 88 So.2d 175 (1956), *aff'd.*, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958).

■ 46. Under Alabama law, as the Alabama Supreme Court said in *Hardie-Tynes Mfg. Co. v. Cruse, supra*, at 78, 66 So. at 661, "every criminal act which injures the person or property of another is also a civil tort redressable by the courts . ." Wilful violation of Section 302 is a criminal act under Subsection 302(d).

■ 47. Courts of Alabama recognize and are bound by the laws of the United States, because, as the Alabama Supreme Court stated in *Forsyth v. Central Foundry Co.*, 240 Ala. 277, 282, 198 So. 706, 710 (1940), "[t]he laws of the United States are as much a part of the law of Alabama as its own local laws." Alabama courts in appropriate cases interpret the duties imposed by the law of other states, as in *Allen Trucking Co., Inc. v. Blakely Peanut Co.*, 340 So.2d 452 (Ct.Civ.App.Ala.1976), interpreting Georgia law as to alleged breach of a duty imposed by Georgia law. In cases which turn upon the interpretation of federal law, the Alabama courts must interpret and apply federal law.

■ 48. A federal damage claim and a state damage claim for unlawful interference with business may arise from the same course of conduct by a union, as in *United Mine Workers v. Meadow Creek Coal Co.*, 263 F.2d 52, 60 (6th Cir. 1959), *cert. denied* 359 U.S. 1013, 79 S.Ct. 1149, 3 L.Ed.2d 1038 (1959), which affirmed an award of compensatory damages under federal law and punitive damages under state law for the same union course of conduct.

■ 49. The Fifth Circuit analyzed the Alabama tort of interference with a lawful business in *Thompson v. Allstate Ins. Co.*, 476 F.2d 746, 748 (5th Cir. 1973), as follows:

. . . prima facie, a cause of action for intentional interference with another's business is established by showing: (1) an intentional act of interference and (2) some consequential harm to the plaintiff's business. *See Sparks v. McCrary, supra; Carter v. Knapp Motor Co., supra; Kelite Products v. Binzel*, 5 Cir. 1955, 224 F.2d 131. Justification for interference in another's business is an affirmative defense and is no part of the plaintiff's case. . . . [footnote omitted].

The violation of a federal statute such as Section 302 cannot constitute "justification" as a defense to the tort of interference with another's business.

■ 50. Carlough and SMWIA have not urged, and this court does not discern, any justification for the intentional interference by Carlough and SMWIA with the

business of MMCA by violation of Section 302. The central issue with respect to the intentional interference with business of MMCA is whether the demand for SASMI was lawful. As set out above, the demand for SASMI was not lawful because SASMI, as demanded in 1974 negotiations, did not comply with Section 302. The unlawful demand for SASMI cannot constitute a justification for intentional interference with the business of MMCA, and the unlawfulness of the demand and strike for SASMI makes the interference by Carlough and SMWIA with the business of MMCA wrongful for the purposes of the Alabama tort action.

51. MMCA, which has been injured by wrongful interference with its lawful business by Carlough and SMWIA, has a cause of action for damages under Alabama under the theories of law advanced in *Thompson, Russell,* and *Hardie-Tynes, supra.*

52. SMWIA and Carlough wrongfully interfered with the business of MMCA by causing demands and a strike for SASMI in violation of Section 302, and MMCA has demonstrated the essentials of an Alabama tort action for wrongful interference with a lawful occupation. The conclusion that MMCA has an Alabama tort action does not end the inquiry, however, because it must also be decided whether federal law preempts MMCA's claim. On this question, the Court is convinced that MMCA's Alabama tort actions are not preempted by the National Labor Relations Act, or Section 302, because such tort actions pose no risk of interference with the national labor policy.

*The Preemption Issue*

53. The leading case enunciating the doctrine of preemption is *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). *Garmon* held that a state tort action was preempted where there was a substantial risk of interference with national labor policy enunciated in the National Labor Relations Act. *Garmon* did not, however, as the Union Defendants suggest, hold that federal law preempts all state law claims based upon a "course of conduct" which may have violated the National Labor Relations Act.

54. The United States Supreme Court has recognized that a course of conduct which constitutes an unfair labor practice may also give rise to a cause of action for damages. *Russell, supra,* recognized that the same actions by the union which gave a cause of action under the Alabama tort of wrongful interference with a lawful occupation, also may have violated Section 8(b)(1)(A) of the National Labor Relations Act. Another decision, *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), held that a tort action based on breach of the union's duty of fair representation was not preempted, although the court assumed for its argument that "such a breach of duty by the union is an unfair labor practice." *Id.* at 186, 87 S.Ct. at 915, 17 L.Ed.2d at 855.

55. Numerous decisions of the United States Supreme Court have recognized exceptions to the doctrine of preemption. *Sears, Roebuck & Co. v. Carpenters,* 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978) (trespass); *Farmer v. Carpenters,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977) (intentional infliction of mental distress); *Vaca v. Sipes, supra* (breach of the union's duty to represent employees fairly); *Linn v. Plant Guard Workers,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) (libel); *Russell, supra* (the Alabama tort of wrongful interference with a lawful occupation by blocking of access to work); and *United Construction Workers v. Laburnum Construction Corp.,* 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 (1954) (involving a tort action founded on threats of violence).

56. The preemption doctrine enunciated in *Garmon, supra,* protects the jurisdiction of the National Labor Relations Board with respect to conduct that is *arguably protected* or *arguably prohibited* under the National Labor Relations Act. As the Supreme Court has recently stated in *Sears, supra,* "the Court has refused to apply the *Garmon* guidelines in a literal, mechanical

fashion." 436 U.S. at 188, 98 S.Ct. at 1753, 56 L.Ed.2d at 220, citing Farmer, supra, 430 U.S. at 296–97, 97 S.Ct. at 1061–62, 51 L.Ed.2d at 338. The Court in Sears considered whether the controversy presented to the state court was identical to, or different from that which could have been presented to the National Labor Relations Board:

> The critical inquiry, therefore, is not whether the State is enforcing a law relating specifically to labor relations or one of general application, but whether the controversy presented to the state court is identical to . . . or different from . . . that which could have been, but was not presented to the Labor Board. For it is only in the former situation that a state court's exercise of jurisdiction necessarily involves a risk of interference with the unfair labor practice jurisdiction of the Board which the arguably prohibited branch of the Garmon doctrine was designed to avoid.

436 U.S. at 197, 98 S.Ct. at 1758, 56 L.Ed.2d at 225 (footnote omitted).

■ 57. Vaca, supra, recognized a cause of action for breach of the union duty of fair representation, a duty which itself is derived from federal law, the National Labor Relations Act. As the Court recognized in Vaca, breach of the duty of fair representation, which violates Section 8(b)(3) of the NLRA, simultaneously gives rise to a cause of action which is not preempted.

58. The Court in Vaca reasoned that a claim cognizable in state courts could arise from breach of a federal statutory duty, and that the national labor policy did not require preemption of such a claim for breach of the duty of fair representation. The Court subsequently analyzed Vaca in Amalgamated Assn. of Street, Electric Railway, and Motor Coach Employees v. Lockridge, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971), recognizing that preemption does not preclude causes of action where the particular rule of law sought to be invoked before another tribunal is so structured and administered that, in virtually all instances, it is safe to presume that judicial supervision will not disserve the interests promoted by the federal labor statutes, Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

Id. at 297–98, 91 S.Ct. at 1923, 29 L.Ed.2d at 489.

59. The controversy which underlies the MMCA state law claims is whether the demands and strike for SASMI, which were caused by SMWIA and Carlough, and which interfered with the business of MMCA, were wrongful because they violated Section 302. That controversy, the wrongfulness of the demands and the strike under Section 302, is not within the jurisdiction of the National Labor Relations Board, as the National Labor Relations Board explicitly recognized in Sheet Metal Workers International Association (Central Florida Sheet Metal Contractors Association, Inc.), 234 N.L.R.B No. 162, pp. 13–14 (1978):

> [W]e conclude that the Board does not possess jurisdiction to determine whether SASMI violates the equal representation requirement of Section 302(c)(5)(B). In reaching this conclusion, we first note that Congress, in Section 10(a) of the Act, vested the Board with jurisdiction over conduct which constitutes a violation of Section 8, and, as we have indicated above, the cases relied on by the Administrative Law Judge herein certainly do not support the principle that we should, sua sponte, extend that jurisdiction to encompass alleged violations of Section 302(c)(5). Aside from that, however, after assiduously considering our obligation to be mindful of other statutory policies in administering our Act, we think it clear that the grant of jurisdiction contained in Section 302(e) indicates the intention of Congress that the judiciary, and only the judiciary, shall construe the substantive provision of that section.

■ 60. Violation of Section 302, which is the underlying wrong upon which MMCA bases its state law claims, is neither arguably protected nor arguably prohibited by the National Labor Relations Act.

61. The National Labor Relations Board has jurisdiction to determine whether demands (and a strike) for SASMI violate Sections 8(b)(3) or 8(b)(1)(B) of the National Labor Relations Act. Whether such demands (and the strike in support of these demands) violate Section 302 is a distinct issue, which is within the jurisdiction of the courts, not the National Labor Relations Board.

62. Here, as *Lockridge* analyzed *Vaca,* the "rule of law sought to be invoked," Section 302, "is so structured and administered that . . . it is safe to presume that judicial supervision will not disserve the interests promoted by the federal labor statutes". 403 U.S. at 297–98, 91 S.Ct. at 1923, 29 L.Ed.2d at 489.

63. State law claims founded upon breach of the legal duty imposed by Section 302, "create no realistic risk of interference with the Labor Board's primary jurisdiction to enforce the statutory prohibition against unfair labor practices" under the analysis of Court in *Sears, supra,* 436 U.S. at 198, 98 S.Ct. at 1758, 56 L.Ed.2d at 226.

64. The *Sears,* analysis is not confined (as the Union Defendants suggest) to situations in which no unfair labor practice charges were filed. Although *Sears* involved a case in which no unfair labor practices were filed, it does not follow that the filing of unfair labor practice charges automatically preempts state causes of action. As the National Labor Relations Board itself has recognized, state law may provide additional remedies for the same conduct which is the subject of meritorious unfair labor practice charges because state law causes of action which are not otherwise preempted survive the filing of unfair labor practice charges. In *Union de Tronquistas* (Lock Joint Pipe & Co. of Puerto Rico), 202 N.L.R.B 399 (1973), the National Labor Relations Board refrained from awarding damages for certain union unfair labor practices on the explicit basis that injured parties had adequate surviving state law remedies arising from the same course of conduct:

The lack of a Board order awarding backpay to employees unable to work because of injuries resulting from a union's unlawful conduct will not leave such employees without redress against those responsible for their injuries. These individuals will still have available those private remedies traditionally used to process claims resulting from another's tortious conduct.

65. MMCA is entitled to damages for injuries sustained by MMCA as a result of wrongful interference with its lawful occupation caused by Carlough and SMWIA in violation of Section 302.

66. Alabama law will permit the recovery of punitive damages in labor disputes such as this upon a showing that the tortious conduct is wilful or malicious. *International Union, U. A. W. v. Russell,* 356 U.S. 634, 646; 78 S.Ct. 932, 939; 2 L.Ed.2d 1030 (1958).

*The Seventh Cause of Action*

67. The Seventh Cause of Action arises under Section 303 of the Labor Management Relations Act, as amended, 29 U.S.C. § 187. Section 303 gives a cause of action to any person injured by violation of section 8(b)(4) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(b)(4).

68. Section 8(b)(4)(A), 29 U.S.C. § 158(b)(4)(A), in pertinent part, prohibits restraint or coercion of a person by a labor organization or its agents with an object of "forcing . . . any employer . . . to join any . . . employer organization."

69. Section 8(b)(4)(A) prohibits efforts by a labor organization or its agents to force an employer to *act as if it belonged* to an employer organization, or to force an employer to engage in industry-wide bargaining. *Frito-Lay, Inc. v. Teamsters,* 401 F.Supp. 370 (N.D.Cal.1975) (Frito-Lay I); *Frito-Lay, Inc. v. Teamsters,* 94 L.R.R.M. 3047 (N.D.Cal. March 26, 1976, and February 8, 1977) (Frito-Lay II). Judge Renfrew in *Frito-Lay I,* reasoned as follows:

The first issue before the Court is whether Section 8(b)(4)(A) prohibits only strikes whose object is to force an employer to join an employer organization or whether it also prohibits a strike whose object has the practical effect of forcing all companies in an industry to accept one identical contract even though there is no formal employer organization.

\* \* \*. \* \* \*

In light of this legislative history, the Court concludes that Congress intended to proscribe involuntary industry-wide bargaining when it enacted Section 8(b)(4)(A). Accordingly, the Court holds that Section 8(b)(4)(A) proscribes not only strikes where an object thereof is to force an employer to join a formal employer organization, but also strikes where an object thereof is to force several employers to act in effect as if they belonged to such an employer organization which engaged in industry-wide bargaining on their behalf. To hold otherwise would be to exalt form over substance and disregard the totality of the forces which gave rise to Section 8(b)(4)(A). If defendants conduct their collective bargaining in a manner which forces employers in an industry to act as if they were members of a formal employer organization, then there is no reason not to subject them to civil liability under Section 303(b) of the LMRA.

401 F.Supp at 373, 375–76.

70. MMCA was restrained and coerced by the strike of employees represented by Sheet Metal Workers Local 441 which was caused by Carlough and SMWIA, with an objective of forcing MMCA to agree to SASMI. Agreement to Article X, Section 8, of the "Standard Form of Union Agreement" was a condition of SASMI, and Article X, Section 8, would require that MMCA surrender collective bargaining authority to SMACNA, to fix new contract terms.

71. SMACNA is an employer organization within the meaning of Section 8(b)(4)(A).

72. The demand that MMCA agree on behalf of employers represented by MMCA to SASMI, and thereby to Article X, Section 8, was, in effect, a demand that MMCA, and employers represented by MMCA, act as if they had joined SMACNA, an employer organization, for the purpose of determining new contract terms pursuant to Article X, Section 8.

73. SMWIA and Carlough caused a strike which restrained and coerced MMCA with an objective of forcing MMCA to engage in limited industry-wide bargaining with respect to the industry-wide SASMI Trust Fund. Involuntary industry-wide bargaining is the evil which Section 8(b)(4)(A) was intended to prevent, see Frito-Lay I, supra, and the effort to compel involuntary industry-wide bargaining for SASMI, although limited in scope to a particular issue, is nonetheless prohibited by Section 8(b)(4)(A).

74. MMCA is entitled to damages which it suffered as a result of restraint and coercion by SMWIA and Carlough, to force MMCA to agree to Article X, Section 8, of the "Standard Form of Union Agreement", which was a condition of participation in SASMI, and to force MMCA to engage in involuntary industry-wide bargaining with respect to SASMI. Accordingly,

The renewed motion of the defendants Carlough, Doby, Hinkle, SMWIA and Local 441 for summary judgment as to the Fourth, Fifth, and Seventh Causes of Action is DENIED; and the Court, having concluded that there is no genuine issue as to any material fact except as to the amount of damages, and having concluded that the plaintiff, MMCA, is entitled to judgment as a matter of law under the Third, Fourth, Fifth, and Seventh Causes of Action for such amount as shall be found to be due MMCA as damages, the Court is of the opinion that summary judgment is due to be entered in favor of MMCA under the Third, Fourth, Fifth, and Seventh Causes of Action for such amount as may be due MMCA as damages and that this cause is due to be placed on the calendar for trial on the sole issue of damages.