612 P.2d 241

**M & M RENTAL TOOLS, INC., a corporation, Plaintiff-Appellant,**

v.

**MILCHEM, INC., a corporation and Theodore Briggs, an Individual, Defendants-Appellees.**

**No. 4282.**

Court of Appeals of New Mexico.

May 22, 1980.

R. W. Gallini, Heidel, Samberson, Gallini, Williams & Harrington, Lovington, for plaintiff-appellant.

Lowell Stout, Hobbs, Lynn Pickard, Pickard & Singleton, Santa Fe, for defendants-appellees.

## OPINION

WOOD, Chief Judge.

This appeal involves interference with prospective contractual relations. Plaintiff contended it was about to rent a centrifugal pump to a customer and defendants wrongfully interfered with this prospect. Defendants rented the pump to the customer, but had plaintiff install the pump. Plaintiff complains that the trial court improperly permitted defendants to cross-examine concerning plaintiff's charge for the installation. We disagree. The cross-examination tended to show that plaintiff overcharged for installing the pump. This was relevant to the reasonableness of plaintiff's claimed damages from

loss of the rental, it being undisputed that plaintiff sought to charge a higher rental than its competitor. After reviewing the evidence and stating the pertinent findings of the trial court, we discuss: (1) the tort; (2) "improper" interference; and (3) who proves what.

The customer was Baker of Maddox Energy Company. Swaco, plaintiff and defendants were competitors in the rental of pumps. Baker telephoned Owens of Swaco to rent a centrifugal pump; Owens did not have one available; Owens told Baker, "I would get them a pump out there."

Owens telephoned to plaintiff's office in Carlsbad. The telephone was answered by Salmon, an employee of plaintiff. Owens "asked if we had any centrifugal pumps, you know. I knew we had pumps, but the word 'centrifugal' threw me off. That was the first time I had heard it called that. So, I asked Mike to take the phone * *."

Mike Meyers was a former employee of plaintiff. He was present on plaintiff's premises doing welding on an office building pursuant to contract. Briggs was also a former employee of plaintiff; on the day of the telephone call, Briggs was working for defendant. Briggs was on plaintiff's premises "[j]ust visiting."

Salmon handed the telephone to Meyers; Owens asked if plaintiff had a pump. Meyers said he did not know, looked out of the window and did not see one; Meyers said he would call Power on the radio. Power was the Carlsbad manager for plaintiff. During this conversation between Owens and Meyers, Briggs learned from Salmon that Owens was the person who had telephoned. Briggs said: "'Let me talk to him.'" Meyers handed Briggs the telephone and picked up the microphone to radio to Power. Meyers heard Briggs say: "'Do you need a pump?' Then, he said, 'Well, I've got one.' Then, he says, 'Okay, when do you want it.'" Meyers decided not to radio to Power; he put the microphone down.

After Briggs told Owens that Briggs had a pump available, Owens told Briggs: "I had already told Bill Baker that I was going to call M & M. If he wanted to provide one, he would have to contact Bill Baker and get the okay from him." Briggs asked if it would be all right for Briggs to contact Baker; in response, Owens gave Briggs the telephone number of Baker.

When Owens telephoned to plaintiff's office, his intention was to rent a pump from plaintiff. On cross-examination, Owens agreed that he told Briggs he did not care if Briggs furnished the pump "as long as they got a pump out there[.]"

The basis for plaintiff's claim is the interference by Briggs in asking to talk to Owens just as Meyers picked up the microphone to radio to Power as to whether plaintiff had a pump available. Meyers testified he voluntarily handed the telephone to Briggs; Briggs did not grab the telephone. At that point in time, neither plaintiff's employee, Salmon, nor plaintiff's former employee, Meyers, knew whether plaintiff had a pump available to rent. Neither Salmon nor Meyers objected when Briggs asked to talk to Owens. Briggs did no more than make the inquiries set forth above; he made no representations as to whether plaintiff had a pump available. Briggs' inquiries were not objectionable to Owens; Owens supplied Briggs the telephone number of Baker.

Defendant, through Briggs, rented its pump to Maddox Energy Company, the customer. The evidence is that plaintiff did have a pump available for rent.

At the close of plaintiff's case-in-chief, defendants moved for dismissal under R.Civ.Proc. 41(b). The motion was granted. The trial court found:

3. Defendants did not wrongfully or improperly interfere with any contractual or prospective contractual relation of Plaintiff's.

\*    \*    \*    \*    \*    \*

6. Plaintiff's evidence failed to establish that Defendants intentionally and wrongfully caused any third party not to enter into a prospective contractual or business relation with Plaintiff.

7. The rental of the pump involved the competitive relationship between Plaintiff and Defendants. Defendants did not employ any wrongful means to rent the pump and any acts by Defendants in renting the pump were a legal competitive right and not an improper interference with any business relations or expected business relations of Plaintiff.

Plaintiff's contentions on appeal are that 1) Briggs "had no legal justification or excuse to intercede and interfere in Plaintiff's business by interrupting a telephone order for Plaintiff's equipment"; 2) "Briggs took advantage of the fact that Jack Power was out of the office and the only ones there were" Salmon "who had not worked there long * * * and Mike Meyers, a former employee * * * who had no apparent loyalty or feeling of responsibility to Plaintiff"; 3) if "Briggs had minded his own business and conducted himself as the guest he was supposed to be then Mike Meyers would have contacted Jack Power by radio and informed him that Ray Owens wanted to rent an M & M pump"; and 4) "there is no question but that the Plaintiff had proven that Defendants wrongfully and intentionally interfered with its business relations and contractual relations * * *. Defendants had no right, excuse or legal justification to speak to one of Plaintiff's customers who had called Plaintiff's place of business to place an order for a centrifugal pump. * * * Therefore, as against the Motion to Dismiss, the Plaintiff made such a case for interference * * * that it was incumbent upon the Defendants to go forward with their proof and establish, if they could, the fairness of their actions and conduct, together with their justification or privilege, if any."

*The Tort*

In discussions of the type of situation involved in this case, terms such as "economic expectancies" and "prospective advantage" have been used. 1 Harper & James, The Law of Torts (1956), § 6.11; Prosser, Law of Torts (4th ed. 1971), § 130. See *Wolf v. Perry*, 65 N.M. 457 at 463, 339 P.2d 679 (1959). A less general term was used in *Williams v. Ashcraft*, 72 N.M. 120, 381 P.2d 55 (1963); the term used was "interference with the business relations of another." Restatement of Torts 2d (1979), in its Introductory Note to Chapter 37, is more specific. The Introductory Note refers to "the tort of interference with existing or prospective contractual relations". This case does not involve some general interference matter, nor does it involve existing contractual relations because no contract was proved. This case involves prospective contractual relations.

*Wolf v. Perry*, supra, recognized the tort of interference with an existing contract. Other New Mexico decisions have involved either a contract or the absence of a contract. *Shriners Hosp. for Crippled Ch. v. Kirby Cattle Co.*, 89 N.M. 169, 548 P.2d 449 (1976); *Williams v. Ashcraft*, supra; *Acme Cigarette Services, Inc. v. Gallegos*, 91 N.M. 577, 577 P.2d 885 (Ct.App.1978); *Bynum v. Bynum*, 87 N.M. 195, 531 P.2d 618 (Ct.App. 1975).

■ The tort of interference with prospective contractual relations is well recognized. Annot., 9 A.L.R.2d (1950) at 228; *Harper & James*, supra; *Prosser*, supra; Restatement of Torts 2d, supra, § 766B. We also recognize the tort; a claim of interference with a prospective contractual relation states a claim upon which relief may be granted.

How is the tort to be described?

The first Restatement of Torts described both interference with existing contract and interference with a prospective contract in terms of interference " 'without a privilege to do so' ". *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.*, 283 Or. 201, 582 P.2d 1365 (1978). The second Restatement of Torts describes both torts in terms of "improper interference". See Restatement of Torts 2d, supra, § 766. Why was this change made? Restatement of Torts 2d, Introductory Note, supra, explains that "interference" is an intentional tort that does not fit the pattern for other intentional torts, that in the tort of interference there is no clear-cut distinction between the re-

quirements for a prima facie case and the requirements for a recognized privilege, that "the law in this area has not fully congealed but is still in a formative stage." A neutral single expression was chosen in an effort to avoid meanings and connotations developed in connection with other intentional, but non-interference torts. "The word adopted for use * * * neutral enough to acquire a specialized meaning of its own * * * is 'improper.'"

New. Mexico decisions involving interference with existing contracts have relied on the commentary in the first Restatement of Torts. *Williams v. Ashcraft,* supra; *Wolf v. Perry,* supra. Yet in describing the tort of contract interference, *Wolf v. Perry,* supra, did not limit its description to that of the first Restatement of Torts; rather, the contract interference must have been "without justification or privilege". Restatement of Torts 2d, Introductory Note, supra, states: " 'Justification' is a broader and looser term than 'privilege,' and the consequence has been that its meaning has not been very clear." Inasmuch as *Wolf v. Perry,* supra, did not limit its description of contract interference to the absence of privilege, such a limitation is not applicable to prospective contract interference.

Plaintiff would describe prospective contract interference in the same manner as *Wolf v. Perry,* supra, described contract interference—without justification or privilege. Thus, plaintiff would continue to use that broad, loose and unclear word "justification" and would ignore the explanation in Restatement of Torts 2d, Introductory Note, supra, as to why the Restatement no longer described the tort in terms of privilege.

*Proctor v. Waxler,* 84 N.M. 361, 503 P.2d 644 (1972) adopted Restatement of Torts 2d as the basis for describing liability in slip and fall cases, overruling prior decisions to the extent they were contrary to the Restatement description. The explanation was that the Restatement was "persuasive authority entitled to great weight".

■ In this first New Mexico decision involving prospective contract interference, it would be inappropriate to use outmoded language to describe the tort. We follow *Proctor v. Waxler,* supra, and adopt the description of the tort of interference with prospective contractual relations stated in Restatement of Torts 2d, § 766B. That section reads:

### Intentional Interference with Prospective Contractual Relation

One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

This description, even if applied to interference with existing contractual relations, does not change the basis for imposing liability. What it does do is remove some of the ambiguity from the basis for liability.

*"Improper" Interference*

In cases describing the interference as an absence of privilege, "the cases have turned almost entirely upon the defendant's motive or purpose, and the means by which he has sought to accomplish it." *Prosser,* supra, at 952. *Harper & James,* supra, is to the same effect and explains "bad motive":

A thoroughly bad motive, that is, a purpose solely to harm the plaintiff, of course, is sufficient to exclude any apparent privilege which the interests of the parties might otherwise create, just as such a motive will defeat the immunity of any other conditional privilege. If the defendant does not act in a bona fide attempt to protect his own interest or the interest of others involved in the situation, he forfeits the immunity of the privilege.

Compare *Williams v. Ashcraft,* supra.

Restatement of Torts 2d, supra, § 767 is headed: "Factors in Determining Whether

Interference is Improper". This section includes the factors of motive and means; however, additional factors are listed. The additional factors listed in Restatement of Torts 2d, supra, § 767 need not be considered.

■ Whether the tort is described as improper interference or without privilege, either an improper motive (solely to harm plaintiff), or an improper means is required for liability. *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.*, supra.

■ When the tort is interference with prospective contractual relations, whether the parties are competitors is a consideration in determining whether the motive or means was improper. "Competition," whether called a proper interference or a privilege, extends only to prospective contractual relations; "It does not justify interference with existing contract relations." *Harper & James*, supra, § 6.13.

Restatement of Torts 2d, supra, § 768, pertains to competition as a proper, or improper, interference. Comment b. to § 768 points out that the section "is a special application of the factors determining whether an interference is improper or not, as stated in § 767." Because the additional factors listed in § 767 need not be considered, we do not apply § 768; rather, we consider competition only in relation to whether defendants' motive or means was improper.

■ Defendants cannot be held liable on the basis of improper motive; the evidence is uncontradicted that Briggs' motive was not solely to harm plaintiff. Briggs wanted to rent a pump, and did so.

Nor can defendants be held liable on the basis of improper means. Restatement of Torts 2d, supra, Comment c. to § 767 and Comment e. to § 768 describe wrongful means in terms of predatory means. *Prosser*, supra, states: "[I]t is no tort to beat a business rival to prospective customers. Thus, in the absence of prohibition by statute, illegitimate means, or some other unlawful element," a defendant may seek to increase his business without incurring liability.

Footnote 11 to *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.*, supra, states: "Commonly included among improper means are violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." We do not intimate that this list is definitive; this list does indicate the type of conduct considered to be improper.

The "improper" means relied on by plaintiff were: 1) Briggs taking advantage of the absence of Jack Power; 2) the failure of Briggs to mind his own business; and 3) the failure of Briggs to conduct himself as a guest. These "means" were not of the type considered "improper" by the above authorities. The trial court properly found that, inasmuch as the parties were competitors, Briggs did not employ wrongful means.

*Who Proves What*

Plaintiff's claim was dismissed at the close of its case-in-chief. In contending this dismissal was error, plaintiff asserts it had made out a prima facie case of interference, and it was incumbent upon defendants to produce evidence to show justification or privilege.

A prima facie case argument is inappropriate. In deciding a motion to dismiss under R.Civ.Proc. 41(b), the trial court was not to view the evidence in the light most favorable to plaintiff; rather, it was to weigh the testimony and apply its judgment thereto. *Panhandle Pipe and Steel, Inc. v. Jesko*, 80 N.M. 457, 457 P.2d 705 (1969). Even if defendant had the burden of showing justification or privilege, the trial court could properly consider the evidence bearing on justification or privilege that was admitted during the case-in-chief and, on the basis of that evidence find, as it did, that there was no wrongful interference. Compare *Edwards v. Anaconda Co.*, 115 Ariz. 313, 565 P.2d 190 (Ct.App.1977).

Plaintiff's argument concerning defendants' burden raises the issue of what the parties were required to prove.

When the tort was described in terms of privilege, one view was that plaintiff did

not have to negate the privilege; rather, privilege was an affirmative defense to be asserted and proved by defendants. *Owen v. Williams*, 322 Mass. 356, 77 N.E.2d 318, 9 A.L.R.2d 223 (1948) stated that privilege was a justification and the burden was on defendant to establish the justification. *Prosser*, supra, states:

> Proof of the intentional interference and resulting damage establishes what the New York courts have called a "prima facie tort," casting upon the defendant the burden of avoiding liability by showing that his conduct was privileged.

The foregoing allocation of the burden of introducing evidence, and persuading the fact finder, was not a universal rule. Restatement of Torts 2d, Introductory Note, supra, states:

> [A] requirement that the conduct be not justifiable has been treated by some courts as imposing the responsibility on the plaintiff to allege and prove that the conduct was not justifiable, while other courts have treated justification in accordance with its usual meaning as an affirmative defense.

Judge Lopez' dissent in *Bynum v. Bynum*, supra, placed the burden on plaintiff to prove that defendant's actions were unjustified.

The foregoing differences continue when describing the tort in terms of "improper interference". Restatement of Torts 2d is not helpful, seemingly taking the view that this was a problem for the courts to resolve. See Restatement of Torts 2d, Introductory Note, supra, page 5, § 767, Comments b. and k., § 768, Comment a.

█ Inasmuch as the tort is described in terms of "improper" conduct, it is logical that plaintiff be required to introduce evidence and persuade the fact finder of the impropriety. *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.*, supra, rejected the "prima facie tort" approach and stated the approach "appropriate to claims of tort liability for intentional interference with contractual or other economic relations."

> [S]uch a claim is made out when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. Defendant's liability may arise from improper motives or from the use of improper means. They may be wrongful by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession. No question of privilege arises unless the interference would be wrongful but for the privilege; it becomes an issue only if the acts charged would be tortious on the part of an unprivileged defendant. Even a recognized privilege may be overcome when the means used by defendant are not justified by the reason for recognizing the privilege. [582 P.2d at 1371.]

█ In summary, plaintiff has the burden of proving the interference was improper. Until evidence has been introduced that would sustain this burden, there is no issue as to privilege. Once such evidence has been introduced, defendant has the burden of proving any privilege relied on. The means used by the defendant, to be proved by plaintiff, is evidence to be considered on the question of whether an asserted privilege is applicable.

The judgment of the trial court is affirmed.

IT IS SO ORDERED.

WALTERS, J., concurs.

SUTIN, J., dissents.

SUTIN, Judge (dissenting).

I dissent.

The only issue in this case is whether Briggs intentionally and improperly walked off with a good piece of business that belonged to his former employer. The trial court said: "No." I disagree.

The right to conduct one's business without the wrongful and injurious interference of others is a valuable property right. *Mobile Mechanical Contractors Ass'n v. Carlough*, 456 F.Supp. 310 (D.C.Ala.1978).

Did Briggs' conduct interfere with the business rights of M & M?

At the close of plaintiff's case, defendants moved for judgment under Rule 41(b). Defendants argued:

&ast; &ast; &ast; Any action of Mr. Briggs for renting it [a centrifugal pump] had specific authorization from the persons who were charged in the M & M office to talk to Mr. Ray Owens.

Defendants were mistaken. When Briggs walked in, the two men at M & M were Raymond Salmon and Mike Meyers. Ray was a shophand roustabout. Mike was not an employee of M & M. He was self-employed as a welder. Powers was the manager of the M & M office and was temporarily absent. He was the only person who could give "specific authorization" to Briggs to use the telephone to talk to Ray Owens and Mr. Baker of Maddox Energy. Of course, if Powers had been present, M & M would have rented a pump to Maddox Energy who sought one through Owens. Two pumps were then available.

When Owens called, Ray, who answered the telephone, turned the phone over to Mike, then went outside to look and saw a pump sitting on the right side of the shop. Mike decided to call Powers by radio and picked up the microphone. Briggs asked Ray if that man on the telephone was Owens. Ray said yes. He testified that Briggs said to Mike, "[l]et me talk to him," then reached over and grabbed the phone. Mike testified that he handed the phone to Briggs and heard him say "Do you need a pump?" Then, Briggs said, "Well, I've got one." Then, he said: "Okay, when do you want it?" Mike put the microphone down. Briggs put the telephone down. Briggs then called Maddox Energy and arranged to deliver the pump.

Briggs, recently employed by M & M, knew or could have instantly determined whether M & M had a pump for rent by stepping out of the office and looking. Knowing that the boss was out, Briggs decided to make a deal and took the business away from his former employer.

When Powers returned to the office, Mike just waived at him but said nothing. He was afraid to tell him. He felt that he should have called him. Powers and Briggs then spoke "normally." Briggs said to Powers:

"You know, I'm going to hook up a pump tomorrow for Bill Baker for Maddox Energy. &ast; &ast; &ast; Have you got a crew."

It was the court's opinion that this was a comedy of errors; that it saw no violation of law because Briggs did nothing he wasn't permitted to do.

In my opinion, Briggs interferred with a prospective business advantage of M & M. *Worldwide Commerce, Inc. v. Fruehauf Corp.*, 84 Cal.App.3d 803, 149 Cal.Rptr. 42, 45 (1978) said:

The interest protected in the tort of interference with prospective business advantage &ast; &ast; &ast; *is the interest in reasonable expectations of economic advantage.* The fundamental principle of the tort is that intentional interference with another's efforts to enter into profitable contractual relations is actionable unless it falls within the area of socially acceptable conduct which the law regards as privileged. *The wrong ordinarily requires conduct intended to interrupt negotiations or prevent the consummation of a contract.*

&ast; &ast; &ast; &ast; &ast; &ast;

Modern day authority Witkin writes that *the tort consists of diverting or taking business from another* employing intentional and improper methods which are not within the privilege of fair competition. &ast; &ast; &ast; [Emphasis added.]

In *Azar v. Lehigh Corp.*, 364 So.2d 860, 862 (Fla.App.1978), Azar, a former salesman for defendant was enjoined from interfering with defendant's business relationship. The court said:

There is a narrow line between what constitutes vigorous competition in a free enterprise society and malicious interference with a favorable business relationship. &ast; &ast; &ast;

&ast; &ast; &ast; &ast; &ast; &ast;

\* \* \* In the final analysis, the issue seems to turn upon whether the subject conduct is considered to be "unfair" according to contemporary business standards.

The intentional interference with business expectancies constitutes an actionable tort. It is unnecessary to have an existing business relationship before a recovery can be had. There can be tortious interference if plaintiff was about to enter into such a relationship but had not done so. *Edwards v. Anaconda Co.*, 115 Ariz. 313, 565 P.2d 190 (Ct.App.1977). Plaintiff need not establish an existing business relationship between himself and Maddox Energy. *Fitt v. Schneidewind Realty Corp.*, 81 N.J.Super, 497, 196 A.2d 26 (1963). *Fitt* said:

> The essence of the protection the courts afford those claiming to have been interfered with is in adjudging whether what defendant has done is actionable and not in the exercise of an equal or superior right. The ultimate inquiry for the court is whether the conduct was:
>
> " \* \* \* 'both injurious and transgressive of generally accepted standards of common morality or of law.' \* \* \* *In other words, was the interference by defendant 'sanctioned by the "rules of the game."' \* \* \** There can be no tighter test of liability in this area than that of the common conception of what is right and just dealing under the circumstances. Not only must defendants' motive and purpose be proper but so also must be the means. [Citation omitted.]"

\* \* \* \* \* \*

\* \* \* A wrongful act is one which in the ordinary course of events will infringe upon the rights of another to his damage, or one which is done with the purpose of benefiting the acting party at the other's expense and is not done in the exercise of an equal or superior right. *The mere doing of an act which is damaging to another and the actor's benefit is wrongful and not within the "rules of the game."* [Emphasis added.] [Id. 29–30.]

"*The role of the court is to raise the standard of business morality and care, not judicially to sanction tortious activities.* Higher standards benefit and protect both the innocent members of an industry and the general public." [Emphasis added.] *Wear-Ever Aluminum v. Townecraft Industries*, 75 N.J.Super. 135, 182 A.2d 387, 394 (1962); *Island Air, Inc. v. LaBar*, 18 Wash. App. 129, 566 P.2d 972, 980 (1977).

When courts speak in terms of "standards of business morality and care," "the rules of the game," and "contemporary business standards," they speak affirmatively in favor of persons from whom business was diverted or taken. They seek to place those who interfere with another's prospective advantage, business expectancies or economic advantage, upon a high level of ethical conduct. Once a tortfeasor has knowledge of plaintiff's interests and intentionally interferes with those interests, there should be no difficulty in finding liability where the tortfeasor has acted with the desire and purpose of appropriating the benefits to himself.

A line of demarcation should be based upon whether one who interferes acts to protect his own direct financial or business interests in fair competition which might otherwise be detrimentally harmed, or whether he is selfishly acting to appropriate the interests and benefits of another to promote his own welfare or to advance some future goal.

The laws of competition in business are harsh enough at best. A person may engage in the sharpest competition with those in like business by holding out extraordinary inducements. If, however, he oversteps that line and commits an intentional act when he knows that economic benefits flow toward his competitor, and steps in and breaks off this economic advantage to capture these benefits for himself, his conduct contains elements of moral turpitude. It is not fair competition. It is wrongful or illegal and if damage results from it, the injured party is entitled to redress. For many years there has "been a distinct and growing tendency of the courts to look be-

neath the letter of the law and give some effect to its beneficient spirit, thereby preventing the perversion of rules intended for the protection of human rights into engines of oppression and wrong." *Dunshee v. Standard Oil Co.*, 152 Iowa 618, 132 N.W. 371, 373 (1911). See, Estes, *Expanding Horizons in the Law of Torts—Tortious Interference*, 23 Drake L.Rev. 341 (1974).

Due to the vast expansion of business and industry, the vast changes in employment and business relations and the intense competitive spirit in the free enterprise system, courts must expand the spirit of the law to disparage the tortfeasor who interferes with business expectancies and economic advantage.

Briggs' conduct was equivalent to one who is present in a competitor's office with no one present, who answers the telephone and surreptitiously accepts the business coming to his competitor. Then, without notice thereof, requests assistance of his competitor to the competitor's damage and the tortfeasor's profit. To sanction this conduct leads to "outrage and indignity," violence, insult and affront. M & M should not be required to post signs that state "Former Employees Engaged In A Competitive Business—Stay Off This Property."

Briggs intentionally and improperly walked off M & M's property with a good piece of business that belonged to his former employer. M & M was not subject to a motion under Rule 41(b).

The judgment entered should be reversed.