**Eleanor SCHULER, Plaintiff,**

v.

**THE McGRAW–HILL COMPANIES, INC., including Business Week, an unincorporated division or subsidiary of The McGraw–Hill Companies, Inc., a New York corporation, Business Week Online, Gary Weiss, individually and as employee of The McGraw–Hill Companies, Inc., and Michael Schroeder, individually and as employee of The McGraw–Hill Companies, Inc., Defendants.**

**No. Civ. 96–292 SC/RLP.**

United States District Court, D. New Mexico.

June 11, 1997.

---

Donna Trujillo Dodd, Albuquerque, NM, for Plaintiff.

William S. Dixon, Charles Kipps Purcell, Rodey, Dickason, Sloan, Akin & Robb, Albuquerque, NM, for Defendants.

## MEMORANDUM OPINION AND ORDER

CAMPOS, Senior District Judge.

THIS MATTER comes before the Court on Defendants' Motion to Dismiss, filed January 6, 1997. The Court, having considered the motion and memoranda submitted by the parties, and being apprised of the applicable law, finds that the motion is well taken. I shall grant the motion for the reasons set forth below.

### I. BACKGROUND

This lawsuit arises out of an article published in BUSINESS WEEK magazine. Plaintiff avers various claims, including defamation, invasion of privacy, interference with business relations, intentional infliction of emotional distress, and prima facie tort. In a Memorandum Opinion and Order filed in October 1996, I denied Plaintiff's Motion to Remand, and I directed Plaintiff to file an amended complaint in order to provide Defendants a more definite statement of her defamation claim. Plaintiff filed her First Amended Complaint, and Defendants now seek dismissal of that complaint for its alleged failure to state a claim upon which relief can be granted.

### II. DEFENDANTS' MOTION TO DISMISS

#### A. Legal Standard

Granting a motion to dismiss for failure to state a claim is " 'a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice.' " *Ramirez v. Oklahoma Dept. of Mental Health*, 41 F.3d 584, 586–87 (10th Cir.1994) (*quoting Morgan v. City of Rawlins*, 792 F.2d 975, 978 (10th Cir.1986)). When ruling on a 12(b)(6) motion, I must construe the plaintiff's complaint liberally. *Swanson v. Bixler*, 750 F.2d

810, 813 (10th Cir.1984). All of the well-pleaded allegations in the complaint must be accepted as true. *Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 810, 127 L.Ed.2d 114 (1994). Conclusory allegations, however, need not be taken as true. *Swanson*, 750 F.2d at 813. All reasonable inferences must be indulged in favor of the plaintiff. *Weatherhead v. Globe International, Inc.*, 832 F.2d 1226, 1228 (10th Cir.1987). A claim may be dismissed only when "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

### B. Facts

The facts, for the purposes of the motion to dismiss, are as follows. In September 1994, BUSINESS WEEK ran an article entitled "Did the Amex Turn a Blind Eye to a 'Showcase' Stock?" The article's subtitle stated, "[t]he bizarre Printron case shows the exchange too often ignores the most glaring signs of trouble." The article recounts a chapter in the story of the American Stock Exchange's ("the Amex") listing of small companies on the Emerging Company Marketplace ("ECM"). In particular, the article focuses on Printron, Inc., an Albuquerque-based company. Prior to the time the article was published, Plaintiff had been the CEO of Printron.

The article refers to Plaintiff's status as a transsexual and it treats certain aspects of her life when she was a man known as John Huminik, Jr. The article also examines Plaintiff's involvement in two lawsuits filed against her by the Securities and Exchange Commission ("SEC"). One of the lawsuits was filed against Plaintiff in the mid-1970s when she was John Huminik; the other was filed against Plaintiff in 1991 when she was Eleanor Schuler, that is, after her sex change. Both lawsuits were resolved by injunctions barring Plaintiff from committing future securities law violations. In both cases, Plaintiff neither admitted nor denied the allegations against her; however, she signed consent decrees agreeing to entry of the permanent injunctions.

After Printron was listed on the ECM, the value of its stock plummeted from fourteen dollars ($14.00) per share to twenty-two cents ($.22) per share. The article criticizes the Amex for failing to screen companies properly before listing them on the ECM. In addition, the article criticizes Printron for failing to reveal to investors Plaintiff's involvement in the SEC lawsuit filed against her when she was a man. The article raises the question of why Schuler received such lenient treatment in the 1991 lawsuit, and the article speculates that perhaps the SEC did not know that Huminik and Schuler were the same person.

### C. Discussion

#### 1. Defamation

In general, a plaintiff must prove the following elements in order to prevail on a defamation claim: 1) the defendant published a defamatory communication; 2) the communication contained a false statement of fact; 3) the communication was concerning the plaintiff; and 4) the communication proximately caused actual injury to the plaintiff's reputation. N.M. UJI § 13–1002 (1997). In addition, a plaintiff must prove a certain level of culpability on the part of the defendant. The level of culpability that the plaintiff must prove depends upon whether the plaintiff is considered a public figure. The question of whether a person is a public figure is a question of law for the court. *Marchiondo v. Brown*, 98 N.M. 394, 399, 649 P.2d 462 (1982).

If the plaintiff is a public figure, she must prove that the defendant acted with actual malice when publishing the defamatory communication. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). That is, a public figure must prove that the defendant knew the statement was false, or that the defendant acted with reckless disregard for the truth or falsity of the statement. *Id.* 376 U.S. at 280. By contrast, an ordinary negligence standard of proof applies to a private defamation plaintiff. *Newberry v. Allied Stores, Inc.*, 108 N.M. 424, 429, 773 P.2d 1231, 1236 (1989). Thus, a private defamation plaintiff need only prove that the defendant

negligently failed to recognize the falsity of the statement.

Plaintiff alleges that she was a public figure from 1966 to 1979. She claims, however, to have been a "private figure" at all times relevant to this action. The Supreme Court has expressly declined to decide "whether or when an individual who was once a public figure may lose that status by the passage of time." *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 166 n. 7, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979). In any event, it is not necessary for me to decide the issue. I shall assume, without deciding, that Plaintiff is not a public figure; therefore, her claim that Defendants' article was defamatory will be governed by an ordinary negligence standard. If she has not stated a claim under this standard, she would be unable to state a claim under the more stringent "actual malice" standard.

▪ As for the article itself, as stated above, it must be defamatory. A statement is defamatory if "it has a tendency to render the party about whom it is published contemptible or ridiculous in public estimation, or expose him to public hatred or contempt, or hinder virtuous men from associating with him." *Andrews v. Stallings*, 119 N.M. 478, 482, 892 P.2d 611, 615 (Ct.App.1995) (citation omitted). The defamatory communication must contain a false statement of fact. The expression of an opinion or an idea is generally protected by the First Amendment to the United States Constitution. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *but cf. Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (no separate constitutional privilege for opinions apart from protections delineated in prior cases). However, an opinion can be actionable "if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." *Andrews*, 119 N.M. at 482, 892 P.2d at 615 (*citing* RESTATEMENT (SECOND) OF TORTS § 566 (1976)). The trial court determines in the first instance whether a statement is fact or opinion, assuming the statement is unambiguously one or the other. *Marchiondo*, 98 N.M. at 404, 649 P.2d at 472 (1982) (citation omitted).

▪ One final requirement of a defamatory communication, as noted above, is that the communication must be concerning the plaintiff. "The communication is concerning the plaintiff if the person to whom it was communicated reasonably understood that it was intended to refer to the plaintiff." N.M. UJI § 13–1005 (1997); *see also* RESTATEMENT (SECOND) OF TORTS § 564 (1977) ("[a] defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer.")

With the above precepts in mind, I turn now to the merits of Plaintiff's defamation claim. Plaintiff points to various portions of the BUSINESS WEEK article which she claims are defamatory. She distinguishes between statements which are allegedly defamatory *per se* and those which are allegedly defamatory *per quod*. The *per se/per quod* distinction "has probably been overtaken by rulings of the United States Supreme Court." *Newberry*, 108 N.M. at 429, 773 P.2d at 1236. While the New Mexico Supreme Court has not abolished the distinction outright, it has noted its dissatisfaction with jury instructions incorporating the distinction. *Marchiondo*, 98 N.M. at 403, 649 P.2d at 471. Accordingly, the latest version of the N.M. Uniform Jury Instructions does not contain any such distinction. *See* N.M. UJI § 13–1002 (1997), committee comment (noting that, in keeping with *Marchiondo*, the current instruction abolishes the *per se/per quod* distinction). I, therefore, will draw no distinction between the statements which Plaintiff claims are actionable. Throughout the discussion which follows, the allegedly defamatory statements will be noted in italics.

a. *"Change sex, change the past: before becoming Printron CEO as Eleanor Schuler, John Huminik Jr. ran two companies the SEC accused of fraud. Who knew?"*

▪ Defendants argue that this does not constitute a false statement of fact. That the SEC accused John Huminik and two of his companies of fraud is a true statement. Plaintiff claims that the statement implies that Schuler changed her sex in order to

conceal an SEC filing rather than to cure her gender dysphoria syndrome. Plaintiff also claims that the SEC knew that Schuler and Huminik were one and the same person. The latter contention is at least debatable, since the SEC declined to comment during Defendants' preparation of the article. As for the former contention, regardless of the medical reasons for Plaintiff's decision to change her sex, the article raises the legitimate issue of whether Plaintiff's sex change worked to her advantage by concealing part of her past. I agree that this is not a false statement of fact, nor is it defamatory.

### b. "Did the Amex turn a blind eye to a 'showcase' stock?"

■ Defendants argue that this is a question, not a statement of fact. I agree. Plaintiff argues that the question insinuates wrongdoing on her part. However, taken in isolation, as well as in the context of the rest of the article, this question is not concerning Plaintiff. Rather, the question implies criticism of the stock exchange.

### c. "Finance Investigations"

Defendants argue that this heading is not even a part of the article. Instead, it merely identifies the section of the magazine in which the article appears. This phrase does not constitute a false statement of fact; therefore, it cannot defame Plaintiff.

### d. "The bizarre Printron case shows the exchange too often ignores the most glaring signs of trouble."

■ Defendants argue that this statement criticizes the stock exchange, not Plaintiff. Furthermore, it contains protected opinions, namely that the Printron case is "bizarre" and that the Amex "too often" ignores signs of trouble. I agree.

### e. "But she didn't like to talk about that."

■ Plaintiff argues that this statement is defamatory because it subjects her "to ridicule and contempt as a loyal U.S. citizen." Plaintiff's Response to Motion to Dismiss, at

5. From the context of the article, it appears that the statement refers to Plaintiff's days (when she was a man) as an FBI agent battling Soviet spies during the Cold War, about which she published a book. Stating that Plaintiff does not like to talk about those days is not defamatory, even if she does like to talk about those days. Not every falsehood stated about a person rises to the level of defamation. Furthermore, "[a]lthough the erroneous statement of fact is not worthy of constitutional protection, it is nevertheless inevitable in free debate." *Gertz,* 418 U.S. at 340.

### f. "Checkered Record"

■ Defendants argue that the Constitution protects them from incurring liability for expressing the opinion that Plaintiff's record is "checkered." Plaintiff argues that it is for the jury to decide whether this phrase constitutes an opinion. I find that this phrase unambiguously states an opinion, and, as such, is not defamatory as a matter of law.

### g. "[T]here was a stain on her record. She had twice been sued in Federal Court by the SEC, twice agreeing to injunctions, without admitting or denying guilt, that prohibited her from violating the securities laws. One of the injunctions was known to the Amex when it approved Printron's listing on the ECM. The other was not."

■ Plaintiff insists that these statements are patently false because by law, she had no duty to disclose the 1975 injunction, and, in addition, she signed both consent decrees using the name "Eleanor Schuler."[1] Defendants counter that whether there was a "stain" on Plaintiff's record is a matter of opinion. Furthermore, the statement that Amex knew of one injunction but not the other is not a statement concerning Plaintiff. Finally, Defendants argue that the remainder of the statement is true. I agree with Defendants. In addition, I note that the

---

**1.** The first consent decree was signed late in 1975, around the time of Plaintiff's sex change operation. The 1975 consent decree contains Eleanor Schuler's signature. Beneath the signature line are the words "John Huminik, Jr., now known as Eleanor L. Schuler."

issue of whether Plaintiff had a duty to disclose the earlier injunction is open to legal interpretation, and the article is clear in pointing that out.

> h. *"Eleanor Schuler had two records of alleged securities law transgressions— one as a woman, and one as a man. In fact, the name 'Eleanor Schuler' was one that she had made up out of thin air."*

■ Plaintiff argues that this statement is false because she signed the earlier consent decree "Eleanor Schuler." Therefore, she reasons, the earlier injunction was entered against Schuler and not Huminik. However, the earlier SEC lawsuit was filed against John Huminik. Although the consent decree is a matter of public record, Huminik was the party of record in that lawsuit. A search for litigation filed against "Schuler" may not reveal the lawsuit filed against Huminik. Thus, the first sentence in this statement is true, and, therefore, not defamatory.

Plaintiff argues further that her new name was not "made up out of thin air," but, rather, was "thoroughly researched and thought out." Plaintiff's Response to Motion to Dismiss, at 6. I do not think the two contentions are mutually exclusive. In any event, it goes without saying that the names "John Huminik" and "Eleanor Schuler" bear little resemblance to one another. I fail to see how use of the turn of phrase "out of thin air" defames Plaintiff.

> i. *"Her earlier SEC record, and her change in gender, were concealed by Printron not only from Barnes but from the Amex' 'blue ribbon' panel of Wall Street notables that had handpicked the 23 ECM companies. Schuler also hid her previous identity, and the injunction, from securities regulators in New York, in a 'sunshine law' filing 14 months before the day the balloons fell on the Amex floor."*

■ Defendants argue, as to the second statement, that it is true and is a matter of public record. Plaintiff argues that the statement insinuates that she lied to the

SEC. It is undisputed, however, that Plaintiff did not disclose her previous identity nor her previous injunction in the sunshine law filing. Whether she even had a duty to do so, as discussed above, is a matter of legal opinion. But even if she did not have a legal duty to disclose the fact that she formerly used another name, one could infer that her response, "no," to the question, "[have you] used or been known by any other name?" constituted concealment.

Plaintiff continues to argue that she did not conceal anything which is evident because the consent decree refers to both names, and because her "name and sex had been changed all the way back to her birth certificate," a public record. Plaintiff's Response to Motion to Dismiss, at 6. This argument is not only nonresponsive, but it is irrelevant. At issue are Plaintiff's responses in the sunshine law filing. The fact remains that she answered "no."

■ As to the first statement, Defendants argue that accusations against Printron are not concerning Plaintiff. I agree. In the alternative, even if Plaintiff is so closely identified with Printron that the statement does concern her, it is not a false statement. Plaintiff does not argue that Printron *did* disclose her earlier lawsuit to investors and to the Amex. To say that both consent decrees were signed in her new name is, as noted above, nonresponsive.

> j. *"And the Amex is still reeling from the ECM imbroglio, even though its greatest embarrassment, Printron, has never been publicly aired."*

Defendants argue that this statement expresses constitutionally protected opinions, and, in any event, it is not concerning Plaintiff. Plaintiff does not respond to this argument. I agree that this statement does not defame Plaintiff.

> k. *"Schuler/Huminik affair," "the next Huminik/ Schuler exploit," "Huminik/Schuler matter"*

■ Plaintiff complains that these phrases suggest that she has a multiple personality disorder or that she is "involved in a game

of hide and seek." Plaintiff's Response to Motion to Dismiss, at 12. Defendants counter that these phrases are convenient shorthand for referring to the matters reported in the article. Most obviously, these phrases do not amount to false statements of fact. Referring to Plaintiff using her current and former names does not constitute defamation, especially considering the subject matter of the article. Nor is it defamatory to refer to the situation in which Plaintiff has been involved as an "affair," "exploit," or "matter."

*l. "Printron was little more than a fraud—a 'sting,' as the suit puts it."*

■ Plaintiff fails to note that the article states that this is an allegation from a lawsuit filed against Printron in United States District Court in New York. Defendants argue that, as such, it is protected by the fair report privilege which provides that "no liability will attach for the republication of the defamatory statements so long as the republication is a fair and accurate report of an official or public proceeding." *Stover v. Journal Publishing Co.,* 105 N.M. 291, 294, 731 P.2d 1335, 1338 (Ct.App.1985). This privilege can be abused if a publisher does not give a fair and accurate report of the proceeding. *Id.,* 105 N.M. at 295, 731 P.2d at 1339. Plaintiff does not argue that Defendants have abused this privilege, nor does she respond in any way to Defendants' argument. I find that this statement is indeed protected by the fair report privilege.

*m. "How did Printron get past the gatekeepers at the Amex? Could the Printron fiasco be repeated?"*

■ Defendants argue that these are not false statements of fact, but, rather, questions. Furthermore, they are not concerning Plaintiff. Instead, they are critical of the stock exchange. I agree.

*n. "He was a double agent for the FBI and the Soviet government."*

■ Defendants argue that this statement is true. Plaintiff does not respond to this argument. My conclusion that this statement is true is supported by the fact that Plaintiff herself wrote a book entitled *Double Agent* recounting her experiences as a spy during the Cold War.

*o. "As recounted in his slickly written 1967 book."*

■ Plaintiff complains that to describe her book as "slickly written" is not complimentary. Plaintiff argues that even if this statement expresses an opinion, it is not protected because it is based upon the existence of undisclosed defamatory facts. However, she never bothers to identify what those "undisclosed facts" might be. The Court is not required to guess. The term "slick" is capable of various meanings, some complimentary, and some insulting.[2] Nonetheless, to express the opinion that Plaintiff's book is "slick" simply does not give rise to liability.

*p. "Neither the book nor the double-agent career were mentioned in any of Printron's filings with investors and regulators."*

■ Once again, Plaintiff falls back on her "I had no duty to disclose" argument. That simply is not the point. Either Printron did disclose the double agent career, or it did not. Plaintiff does not claim that it did. Furthermore, the very next sentence in the article states that Printron did not have a duty to disclose such information according to SEC rules.

*q. " 'We have nothing against transsexuals.' "*

■ This is a direct quotation from the lawyer representing an investor who sued Printron. Plaintiff does not dispute the accuracy of the quotation. Instead she argues that the statement insinuates "that transsexualism is a negative state of being," and that

---

**2.** As Justice Holmes expressed it, "[a] word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne v. Eisner,* 245 U.S. 418, 425, 38 S.Ct. 158, 62 L.Ed. 372 (1918).

she had a duty to disclose her sex change in the prospectus. Plaintiff's Response to Motion to Dismiss, at 12. Even if Plaintiff's characterizations are accepted, such "insinuations" would constitute protected opinions.

r. *"At issue is not her sex change, but rather the extent to which her concealment of that change masked other things."*

Plaintiff once again argues that she concealed nothing, relying on the fact that the consent degree was signed in her new name. We have covered this ground previously. The argument is without merit.

s. *"The trouble ... arises whenever Schuler's pre–Schuler activities are mentioned in Printron's public disclosures. Time after time, they refer to Schuler as a 'she'—even when discussing positions held when Schuler was a 'he.'"*

■ Plaintiff argues that the reason all the Printron disclosures use the feminine pronoun is because all of the "documents are signed by Eleanor Schuler, a female." Plaintiff's Response to Motion to Dismiss, at 13. It is undisputed, however, that the first SEC lawsuit was filed against John Huminik. In any event, Plaintiff does not dispute that the public disclosures do, indeed, use only the feminine pronoun. That is what is at issue.

t. *"Was Schuler being shy—or was she improperly misleading investors?"*

■ This is not a statement at all, but, rather, a question. Plaintiff argues that the question insinuates that she has faced criminal charges. She also argues that there is no evidence to support an allegation that she misled investors. Plaintiff's arguments are unavailing in the context of a defamation action.

u. *"Zimmerman maintains that a previous injunction is a 'material event' that must be disclosed beyond the five-year period set by the rules."*

■ Zimmerman is the lawyer representing an investor who sued Printron. He is expressing a legal opinion, which is not actionable. And, as the article points out in the next line, a securities lawyer questioned on the matter stated, " '[i]f you ask a dozen lawyers, you'll get a dozen answers." Amended Complaint for Damages, Ex. 1, p. 4, col. 1, ¶ 3.

v. *"John Huminik was no longer exhibiting a James Bond persona. 'Marine blue shadow haloes the eyelids'.... The Post went on to describe the sex change and, in graphic detail.... None of this would amount to a hill of beans if Eleanor Schuler, as Printron CEO, hadn't fallen afoul of the SEC."*

■ Plaintiff argues that the statement is false. She claims that she has never fallen afoul of the SEC because as CEO of Printron, she has never been sanctioned. This is irrelevant. The SEC has filed two lawsuits against Schuler. Thus, the characterization is a fair one. In any event, it is a matter of opinion whether Plaintiff has "fallen afoul" of the SEC.

w. *"The Huber–Schuler ties were shrugged off by the blue-ribbon panel. 'We were assured by the Amex staff that the issue had been resolved.'"*

■ Plaintiff was brought into the company (Printron) by Mr. Huber, who is a convicted felon and disbarred lawyer. She does not dispute this. Instead, Plaintiff argues that the statement implies that she and Huber were engaged in a conspiracy. She further argues that she was not aware of Huber's past, and she was not under an obligation to investigate. Whether she knew anything about Mr. Huber is irrelevant. "Ties" can be attributed to two people simply because they are employed by the same company. There is nothing defamatory about such a term.

x. *"But Hamarat and another former panel member ... now say that the panel didn't know that Eleanor Schuler used to be John Huminik—or that Schuler consented to not one but two injunctions by the SEC. If they had known, they say, Printron's listing would never have been approved."*

Plaintiff relies on her stock argument that she did not conceal her former identity. She

does not dispute, however, that panel members have stated they did not know that Eleanor Schuler used to be John Huminik. Thus, there is no false statement of fact contained within this passage.

y. *"The SEC's mild treatment of Schuler in 1991 raises yet another issue: Did the SEC know in 1991 that Schuler was Huminik?"*

Quite obviously, once again what we have here is a question. Plaintiff insists that the answer to the question is an affirmative one, and that the article implies that the answer is a negative one. Plaintiff's insistence notwithstanding, Defendants' conduct in posing the question is simply not actionable.

z. *"One explanation might be that the SEC felt so much time had passed that it would not pursue a criminal contempt action against Schuler."*

 This statement expresses a theory or idea. Plaintiff argues that the statement insinuates that she committed criminal acts. On the contrary, the statement speculates as to why Schuler was allowed to sign another consent decree after she had previously been enjoined from committing securities violations. There are various plausible theories, but simply advancing them, as Defendants have done here, is not actionable.

aa. *"But they are listed as two separate people, with one 'incident' to his name and one to hers."*

Plaintiff fails to note that just prior to this statement, the article explains that the National Association of Securities Dealers has both John Huminik and Eleanor Schuler in its database. Plaintiff does not dispute the truth of either statement. Rather, she falls back on the argument that she signed both consent decrees as Eleanor Schuler. This is irrelevant to the issue of whether the electronic database to which Defendants refer attributes the earlier consent decree to John Huminik. Either it does or it does not. Plaintiff does not dispute that it does.

bb. *"A NASD spokesman notes that more detailed information, such as social security numbers, is only maintained for NASD members—not corporate officers who fall afoul of the SEC."*

Defendants argue that this statement is critical of the National Association of Securities Dealers, not of Plaintiff. Plaintiff has failed to respond to this argument. I agree with Defendants that this statement does not defame Plaintiff.

In sum, I find that the article entitled "Did the Amex Turn a Blind Eye to a 'Showcase' Stock?" published in the September 12, 1994 edition of BUSINESS WEEK magazine, did not defame Plaintiff. I note that although I have analyzed each allegedly defamatory statement separately, I have considered each statement in the context of the entire article. Whether the statements are considered in isolation, or in context, they do not meet the elements of defamation according to the law of New Mexico. In regard to Plaintiff's defamation claim, in general, it is worth recalling the words of Judge Learned Hand. He said that the First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." *United States v. Associated Press*, 52 F.Supp. 362, 372 (S.D.N.Y.1943).

## 2. *Invasion of Privacy*

Plaintiff avers three separate invasion of privacy claims: 1) false light; 2) publication of private facts; and 3) intrusion. I shall address each in turn.

### a. *False Light*

 False light invasion of privacy is closely related to defamation. *Andrews*, 119 N.M. at 492, 892 P.2d at 625. However, in order to state a claim for false light invasion of privacy, a plaintiff need not prove that s/he has been defamed. Rather, " '[i]t is enough that he is given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position.' " *Moore v. Sun Publishing*

*Corp.*, 118 N.M. 375, 383, 881 P.2d 735, 743 (Ct.App.1994) (*quoting* Restatement (Second) of Torts § 652E cmt. b, at 395). Thus, like defamation, false light invasion of privacy requires proof of a false statement of fact. *Andrews*, 119 N.M. at 492–93, 892 P.2d at 625–626.

▮ The majority of the statements upon which Plaintiff bases her false light claim are also relied upon to support her defamation claim. I have considered these statements, as well as the additional statements and photographs that allegedly placed Plaintiff in a false light. Furthermore, I have considered Plaintiff's arguments, which essentially mirror those she made in support of her defamation claim. I find that Plaintiff has failed to establish that the article contains false statements of fact which portrayed her in a false light. Thus, this claim must fail.

### b. Publication of Private Facts

▮ "This tort involves the publication of true but intimate or private facts about the plaintiff, such as matters concerning the plaintiff's sexual life or health." *Moore*, 118 N.M. at 383, 881 P.2d at 743 (*quoting* Rodney A. Smolla, Law of Defamation § 10.01[2], at 10–3). In order to be actionable, the facts disclosed may not be public. *McNutt v. New Mexico State Tribune Co.*, 88 N.M. 162, 166, 538 P.2d 804, 808 (1975) (*citing* Prosser on Torts § 117, at 810–11 (1971)). Plaintiff concedes that in the 1970s, she granted interviews to The Washington Post and People magazine, concerning her sex change. She argues that the purpose of those interviews "was to inform the public about people . . . who suffered from gender reversal." Plaintiff's Response to Motion to Dismiss, at 21. She then proceeds to argue that Defendants invaded her privacy because they published facts concerning her sex change, "a topic . . . of no legitimate concern to the public." Plaintiff's Response to Motion to Dismiss, at 22. Plaintiff cannot have it both ways. She sought publicity at the time of her sex change. Even if she shunned publicity several years later, her sex change is a matter of public record. In addition, as Defendants point out, mention of Plaintiff's sex change was not gratuitous, but was cen-

tral to the article's thesis. I find that Plaintiff has failed to state a claim for invasion of privacy based on the publication of private facts.

### c. Intrusion

▮ "This tort, distinct from but related to trespass, involves an invasion of the plaintiff's 'private' space or solitude—eavesdropping on private conversations or peeping through the bedroom window, for example." *Moore*, 118 N.M. at 383, 881 P.2d at 743 (*quoting* Rodney A. Smolla, Law of Defamation § 10.01[2], at 10–3). The intrusion need not be physical. Restatement (Second) of Torts § 652B (1977). However, the intrusion must be upon a person's "private affairs or concerns." *Id.*

Defendants argue that Plaintiff has merely repeated her allegations of publication of private facts, and that they do not state a claim for intrusion. I agree. In addition, Plaintiff has failed to respond to Defendants' motion on this cause of action. Therefore, she has apparently abandoned this claim.

### 3. Intentional Infliction of Emotional Distress

▮ In order to prevail on a claim of intentional infliction of emotional distress, a plaintiff must show that "defendant's conduct was extreme and outrageous, and was done recklessly or with the intent to cause severe emotional distress." *Andrews*, 119 N.M. at 491, 892 P.2d at 624. Extreme and outrageous conduct goes " 'beyond all possible bounds of decency, and [is] to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Id.* (*quoting* Restatement (Second) of Torts § 46 (1965)). As for the emotional distress inflicted, it must be so severe that no reasonable person could be expected to endure it. *Dominguez v. Stone*, 97 N.M. 211, 215, 638 P.2d 423, 427 (Ct.App. 1981). "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Salazar v. Furr's, Inc.*, 629 F.Supp. 1403, 1411 (D.N.M.1986) (*quoting* Restatement (Second) of Torts § 46 cmt. h (1965)).

■ The gravamen of this claim appears to be that the article made numerous references to Plaintiff's "sex," "gender," or "transsexual" status, and that Defendants failed to "check facts" before publishing the article. As discussed above, the article does not contain defamatory falsehood. Furthermore, the references to Plaintiff's transsexual status were highly relevant to the central inquiry of the article. In short, there is nothing extreme or outrageous about Defendants' conduct. Accordingly, their motion will be granted on this claim, as well.

### 4. Interference with Contractual Relations/Prospective Advantage

■ In order to state a claim for tortious interference with existing or prospective contractual relations, a plaintiff must allege that the defendant "interfered [with contractual relations] with an improper motive or by improper means, or acted without justification or privilege." *Quintana v. First Interstate Bank,* 105 N.M. 784, 786, 737 P.2d 896, 898 (Ct.App.1987) (internal citations omitted). The defendant acts with an "improper motive" when s/he acts solely to harm plaintiff. *M & M Rental Tools, Inc. v. Milchem, Inc.,* 94 N.M. 449, 454, 612 P.2d 241, 246 (Ct.App.1980). "Improper means" include "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." *Id.* (citation omitted). The plaintiff bears the burden of proving that the interference was improper. *Anderson v. Dairyland Ins. Co.,* 97 N.M. 155, 159, 637 P.2d 837, 841 (1981). There is a somewhat more difficult burden placed on the plaintiff who seeks to prove interference with prospective advantage:

> 'American courts are not as willing to protect interests in prospective contractual relations as they are to protect interests in existing contracts. Where the defendant is accused of interfering with the plaintiff's opportunity to enter into contracts with third persons, a strong showing must be made that the defendant acted not from a profit motive but from some other motive, such as personal vengeance or spite.'

*Anderson,* 97 N.M. at 158, 637 P.2d at 840 (*quoting* J. HENDERSON & R. PEARSON, THE TORTS PROCESS 1166 (2d ed.1981)).

■ Plaintiff bases her claim for interference on the premise that Defendants defamed her, invaded her privacy, and intentionally inflicted emotional distress on her. I have found that Plaintiff has failed to state a claim for either of these three torts. Furthermore, there is simply no evidence that Defendants acted with an improper motive or used improper means when they published the article. In publishing the article, Defendants were exercising their First Amendment right to freedom of the press. I find that Plaintiff has failed to state a claim for interference with existing or prospective contractual relations.

### 5. Prima Facie Tort

■ The elements of prima facie tort are as follows: "(1) defendant's lawful but intentional act; (2) defendant's intent to injure the plaintiff; (3) injury to the plaintiff; and (4) no justification for defendant's acts." *Andrews,* 119 N.M. at 493, 892 P.2d at 626 (*citing Schmitz v. Smentowski,* 109 N.M. 386, 394, 785 P.2d 726, 734 (1990)). Prima facie tort is intended "to provide remedy for intentionally committed acts that do not fit within the contours of accepted torts." *Schmitz,* 109 N.M. at 396, 785 P.2d at 736. "[P]rima facie tort should not be used to evade stringent requirements of other established doctrines of law." *Id.,* 109 N.M. at 398, 785 P.2d at 738.

■ Plaintiff's reliance on prima facie tort as a means of recovery is misplaced. The conduct alleged by Plaintiff clearly fits within the contours of several traditional torts. Plaintiff is, then, relying on prima facie tort to evade the requirements of these more traditional torts which is not the proper use of this tort. In addition, Plaintiff failed to respond to Defendants motion with regard to this claim. Thus, she has apparently abandoned it.

**NOW, THEREFORE, IT IS ORDERED** that Defendants' Motion to Dismiss [doc.

# 18], filed January 6, 1997, should be, and hereby is, GRANTED.